HARRY O'BANION v. THE MISSOURI PACIFIC RAILWAY COMPANY.

No. 12,738. (69 Pac. 353.)

SYLLABUS BY THE COURT.

1. EVIDENCE — *Estoppel.* A party who, in the cross-examination of a witness, calls for incompetent testimony cannot complain of its admission.

2. RAILROADS — *Trespassers — Authority of Brakeman.* It is within the scope of the implied authority of a brakeman in charge of a freight-train to eject trespassers therefrom. (*K. C. Ft. S. & G. Rld. Co. v. Kelly*, 36 Kan. 655, 14 Pac. 172, 59 Am. Rep. 596.)

3. ———— *Injury to Trespasser — Discharge of Duty — Questions for Jury.* It is peculiarly within the province of a jury to determine whether a brakeman who forcibly ejected a trespasser from a car did so in discharge of the duty he owed the railroad company to remove such persons, or for the purpose of extorting money from such trespasser, or out of resentment to him for his failure to pay a demand for money made by the brakeman.

Error from Leavenworth district court; J. H. GILLPATRICK, judge. Opinion filed July 5, 1902. Reversed.

STATEMENT.

THE plaintiff in error fell under the wheels of a coal-car which was part of a freight-train operated by defendant in error. His left arm was run over,

rendering amputation necessary, and he was other-wise injured.  At the close of the testimony of plaintiff below, the court sustained a demurrer to the evidence.  Whether this ruling of the court was proper depends on the testimony of O'Banion, and the inferences properly to be drawn therefrom.  He testified, in substance, as follows:

"It was on the 11th day of October, 1899, at the foot of Cherokee street, I boarded the Missouri Pacific train going south toward Kansas City.  I got on the car and met a brakeman at the rear end of the train. . . . He wanted to know where I was going, and I told him I was going to Kansas City, and he wanted to know if I had any money, and I told him 'yes.'  I paid the brakeman twenty-five cents to ride from Leavenworth to Kansas City, the first one I met; and I then went three or four cars to the front and met another brakeman, and he wanted to know where I was going, and I told him to Kansas City; and he asked me if I had any money, and I told him 'no'; that I paid the brakeman in the rear. Well, he said I would have to pay him or get off, because he was the head brakeman of the train.  I told him to go to the back and ask that brakeman if I didn't pay him, and if I didn't pay him he could come to me and I would pay him.  Well, he stood there and talked awhile, and I started to pass him, and when I started to pass him he, told me he was head brakeman of the train, and I would have to pay him or else get off the train, and as I made a move to pass him he grabbed hold of my shoulder and pushed me in such a manner as to make me fall beneath the train."

*  *  *  *  *  *  *  *  *  *

"Ques.  What did he have that indicated he was a brakeman?  Ans.  Well, he had a lantern, and he had a stick about a foot and a half long. . . . A stick brakemen generally use in letting on and turning off brakes."

*  *  *  *  *  *  *  *  *  *

"Q. Did you see the brakeman do anything on the train—this last brakeman that you met, I have reference to? A. When I was coming toward him he was letting off the brake."

.    .    .    .    .    .    .    .    .    .    .

"Q. How far ahead of you? A. Four or five cars."

. .    .    .    .    .    .    .    .    .    .    .

"Q. Which way did he push you? A. Backwards.

"Q. Where were you standing at that time? A. Standing on a coal-car, at the end of the platform about a foot and a half long; standing outside of the end-gate."

Upon cross-examination, plaintiff below testified that it was his intention to ride to Kansas City without paying regular fare; that he had no ticket; that at different times before this he had gone down to Kansas City and paid fifteen cents; and that he knew he was not doing right. He was cross-examined further:

"Ques. What did you say to this last brakeman? Ans. I told him to go back and see this other brakeman, and I would get in the coal-car and sit down and wait until he came back, and as I started to go by him he grabbed hold of me and shoved me.    .    .    .    He said he was the head brakeman and I would have to pay him.

"Q. You said you would n't do it? A. I did n't say I would n't do it.

"Q. You started to go right by him? A. No, sir; . I did n't start to go right by him.    .    .    .    He shoved me after I had one foot up; I was just in the act of putting it up.

"Q. To get by him? A. Yes, sir."

.    .    .    . .    .    .    .    .    .    .    .

"Q. And at the time he put up his hands you were just in the act of getting over the end of the gate; just about to start? A. Yes, sir."

.    .    .    .    .    .    .    .    .    .    .    .

O'Banion v. Railway Co.

"Q. He said he was brakeman on that train? A. Yes, sir.

"Q. You supposed he had authority to run it, did n't you? A. Yes, sir.

"Q. And you swear that just as you were attempting to get over the end of that car, after the brakeman told you you must n't come any further, he pushed you, and you slipped and fell; is that right? A. Yes, sir.

"Q. He pushed you a little and you slipped and fell under the car? A. Yes, sir.

"Q. That's right, is it? A. When he shoved me, yes, sir."

.    .    .    .    .    .    .    .    .    .    .

"Q. Did n't he tell you not to go up there? A. No, sir.

"Q. Did n't he tell you you could n't go any further until you paid him? A. He told me if I wanted to ride I would have to pay him.

"Q. And you said you had paid and you were going anyhow? A. No, sir, I did n't tell him I was going anyhow."

.    .    .    .    .    .    .    .    .    .    .

"Q. You lost your footing and fell down; that's right, is it? A. Yes, sir."

.    .    .    .    .    .    .    .    .    .    .

"Q. He did n't strike you with a club? A. No, sir.

"Q. He made no motion to strike you; did n't threaten to strike you with a club? A. No, sir.

"Q. He did n't threaten to strike you with a lantern? A. No, sir."

*J. C. Petherbridge*, and *Dennis Jones*, for plaintiff in error.

*Waggener, Horton & Orr*, for defendant in error.

The opinion of the court was delivered by

SMITH, J.: Counsel for the railway company contend, first, that there was no evidence proving or tending to prove that the person who, it is claimed,

pushed the plaintiff below from the car was in the employ of the railway company in the capacity of a brakeman or otherwise. Many decisions are cited confirming the general rule that the declarations of a person are not competent to prove his authority to act as agent for another. It will be noted, however, that counsel for defendant below, upon cross-examination of the plaintiff, interrogated him as follows :

"Ques. He said he was the head brakeman of that train? Ans. Yes, sir.

"Q. You supposed he had authority to run it, did n't you? A. Yes, sir."

These responses, now claimed to be incompetent, would not have been extracted from the witness except for their supposed benefit to the railway's side of the case. Having sought to profit by the use of such testimony in its behalf, it cannot now be permitted to complain that the adventure was disastrous. It cannot avail a party bringing such testimony before the jury to invoke authority in denial of its competency. This testimony, coupled with the fact that the person who stated the capacity in which he was employed had a brakeman's stick in his hand, and was engaged, when plaintiff approached him, in letting off a brake on the car, was *prima facie* evidence that he was a brakeman in the employ of the railway company.

The second contention of defendant in error is that, "assuming that the person who pushed plaintiff, if he was pushed, was a brakeman in the service of the railway company, then his act complained of was not in the discharge of any duty he owed the company." The argument is that, in pushing the plaintiff from the car, the brakeman was acting on his own account, piqued by the refusal of O'Banion to pay him the

amount demanded for passage on the train.   It cannot be said that a brakeman situated as this one was, in charge of the front end of the train, did not have general authority to remove trespassers therefrom. (*K. C. Ft. S. & G. Rld. Co. v. Kelly*, 36 Kan. 655, 14 Pac. 172, 59 Am. Rep. 596.)

In *U. P. Rly. Co. v. Mitchell*, 56 Kan. 324, 327, 43 Pac. 244, the authority of a brakeman to eject trespassers was recognized by the approval of an instruction given to that effect.   In Elliott on Railroads, volume 3, page 1962, the author notes the rule prevailing in this state, as announced in the case of *K. C. Ft. S. & G. Rld. Co. v. Kelly*, supra, that the ejection of trespassers is within the scope of the implied authority of a brakeman.   If it were clear that in pushing O'Banion from the car the brakeman did so for the purpose of extorting money from him, or inflicted punishment on him in that way for not paying the sum demanded, then we might say that the brakeman was not, when so doing, engaged in the performance of any duty imposed on him by reason of his employment as agent of the railway company.   The brakeman owed a duty to his employer (the railway company) to remove trespassers from the cars which made up the train, and if, in the discharge of such duty, he recklessly or in a wilful, wanton or malicious manner performed it, and ejected a trespasser in a way to cause bodily injury, the railway company was liable for his acts.   (*U. P. Rly. Co. v. Mitchell*, supra.)

Different minds might arrive at different conclusions, after considering the testimony introduced on behalf of plaintiff below, concerning the reasons which impelled the brakeman to act as he did.   We are asked to determine that the motive which actuated him in ejecting the plaintiff was a desire for personal

gain to himself, and that he was not influenced by any obligation of duty which he owed the railway company to keep trespassers from riding on the train. To arrive at the impelling motive in the case was a matter peculiarly within the province of the jury. After a demand for money made by the brakeman, and up to the time of plaintiff's forcible ejection from the car, though the intervening time was short, there was a *locus pœnitentiæ* during which the servant's continuing duty to his employer might have asserted itself and overcome his desire for personal gain, causing him to act solely in the interests of the company and not for his own benefit.

We cannot conclude, considering all the testimony given by the plaintiff below, that his injuries were the result of a wilful attack made on him by a person acting independently of and outside of the range of his employment, when the servant who caused his injuries was, immediately before and directly after the plaintiff was hurt, satisfactorily proved to have been in the service of the company. The intent and purpose with which acts are done can be better ascertained by a jury composed of persons drawn from different vocations in life than by a body of professional men all engaged in one calling. Mr. Thompson, in his Commentaries on the Law of Negligence, says :

"It is obviously a question of fact for the determination of a jury whether, at the time of the particular act or omission by the servant, which caused the injury, the plaintiff's servant was acting within the scope of his employment, or acting outside of it to effect some purpose of his own. (Vol. I, § 615.)

"Whether the person whose immediate negligence or misconduct caused the particular injury was acting at the time as the servant of the person sought to be

charged frequently depends on such a variety of facts that it falls outside of any definite rule, and for that reason becomes, under proper instructions, a question of fact for the jury.''   (Id. § 616.)

The judgment of the court below will be reversed and a new trial ordered.

DOSTER, C. J., POLLOCK, J., concurring: