PARULO v. PHILADELPHIA & R. RY. CO.

(Circuit Court, S. D. New York. June 4, 1906.)

1. RAILROADS—PUSHING TRESPASSER FROM MOVING TRAIN—QUESTION FOR JURY.

Plaintiff in an action against a railroad company for a personal injury testified that, while he was stealing a ride at night on top of a freight car, a man with a lantern' whom he could not recognize came over the top of the cars and ordered hi.n off, and when he did not go kicked him from where he sat between the cars, and he was run over and injured. The trainmen all testified, and each denied seeing plaintiff or anyone else on the train except themselves, and each denied being on top of the cars at the time and place of the injury. It was shown that the brakeman and a flagman each had a lantern, and that it was the brakeman's duty, under the rules of the company, to be on top of the cars and to put off any trespasser. Held, that the question whether or not plaintiff was in fact kicked or pushed from.the car by a servant of defendant, as he claimed, was one for the jury.

[Ed. Note.—Rights of trespassers on train, see note to Southern Ry. Co. v. Shaw, 31 C. C. A. 76.]

2. EVIDENCE—ADMISSIONS—ACQUIESCENCE IN STATEMENTS OF ANOTHER.

To render statements made by another in the presence of a party, and not contradicted by him, binding upon him as admissions, it must clearly appear that he heard and understood them, and that the circumstances were such that his acquiescence therein may fairly be inferred from his silence.

[Ed. Note.—For cases in point, see vol. 20, Cent. Dig. Evidence, §§ 771–774.]

3. SAME—IGNORANCE OF LANGUAGE.

Where plaintiff, an Italian who had just been run over by a railroad train which crushed both his feet, had so little knowledge of English that the physician could not converse with him, and procured another Italian, who could speak English to some extent, to ask plaintiff questions, the testimony of the physician as to the answers as translated by him by the interpreter is not admissible to show admissions by plaintiff respecting the manner of his injury; it not being shown that the translation was correct, or that plaintiff was in such physical condition or had sufficient knowledge of the language to either hear or understand the answers as given in English.

[Ed. Note.—For cases in point, see vol. 20, Cent. Dig. Evidence, § 773.]

4. TRIAL—CONFLICTING EVIDENCE—INSTRUCTIONS.

Where plaintiff testified that he climbed to the top of a freight car at night while the train was stopped at a station, that it started almost immediately, and a few seconds later he was pushed from the top of the car, and it was shown that he was run over and very severely injured, but the trainmen testified that the train while on an up grade did not stop, the jury were properly instructed that it was their duty to reconcile the evidence if possible, and that they were not necessarily required to disbelieve plaintiff's testimony that he was thrown from the top of the car, even if they found that it did not fully stop, if they believed that it was moving so slowly that plaintiff could climb upon it, and that by reason of his injury immediately afterward his recollection was confused, and he was honestly mistaken.

5. RAILROADS—ACTION FOR INJURY.OF PERSON ON TRAIN—INSTRUCTIONS.

Instructions reviewed in an action against a railroad company to recover for the injury of a person alleged to have been thrown or pushed from a moving train, and held not to contain error prejudicial to the defendant.

Motion by defendant to set aside the verdict of the jury in favor of the plaintiff and for a new trial, on the grounds that the verdict is contrary to the evidence and law and upon the exceptions taken upon the trial.

Thomas J. O'Neill, for plaintiff.

Pierre M. Brown, for defendant.

RAY, District Judge. This action has been twice tried. On the first trial the jury disagreed. On the second trial the jury found a verdict for the plaintiff in the sum of $2,000. On the evening of November 7, 1902, the plaintiff, who was working as a stone mason at a place called "Rock Hill," a few miles north of Perkasie, a station on defendant's railroad, being at Perkasie and desiring to go to his home, and having five pounds of meat in a package, went down to the station. He claims that as he arrived close to the station he found a freight train at a standstill, with the engine near the water tank a short distance above and north of the station, the cars extending for some distance to the south of it; that he clambered up the side and to the top of the car some three or four cars back and to the south of the engine, and seated himself on the front end of the car, with his feet hanging down between it and the one next in front. He claims that a few seconds after he had so seated himself the train started on north, and that it had proceeded but a few hundred feet when a man with a lantern, whom he does not claim to recognize, came up behind him, and told him, "Get off the train. I told him a couple of times 'Wait until the train stops.' He said, 'You won't get off, you son of a bitch.' I said 'wait until the train stops,' and he kicked me right off between the two cars." Says he looked at the man, but did not see who he was, and cannot identify him, it was so dark. Says, in substance, that after climbing about a couple of hundred feet, meaning that he crawled, "I walked down on my hands and knees, and hollered," with the blood flowing. That he came to a box car, and remembers nothing else. "I had my senses lost." Says he remembers nothing of being in the depot, but came to his senses in the hospital at Bethlehem. One foot was crushed partially off, and the other wholly severed. At Perkasie the road is double tracked, and runs north and south. The east track is the north-bound track and west track is the south-bound track. This train was on the north-bound track. There is a beaten path or track along the outside of the east rail or the east track, where, evidently, the injuries were received. On the inner rail of this north-bound or east track, at a point 400 or 500 feet north of the depot, some blood and shreds of flesh were found that night, and blood marks and signs of some body dragging along led from that point west across the west or south-bound track, and down into a roadway, and then southerly towards the depot. A witness heard a cry, and later saw the plaintiff crawling along this roadway southerly. He took plaintiff to the freight car, and then followed these marks back to the blood and flesh on the rail. One of his shoes was found close by. This tends to corroborate plaintiff as to the claim that the train had proceeded but a few seconds from the

depot when he was injured. Moving slowly on this up grade, or getting under headway, it would have proceeded about that distance. The plaintiff was stealing a ride. He did not expect or intend to pay fare. The defendant contended that the plaintiff was not on the train, or that if he was he fell off, and was neither pushed nor kicked off; that if pushed or kicked off it was by some interloper or stranger to the train; that it is more probable he was attempting to board the train moving on this up grade, and so fell and went under the car and was injured. The defendant called a witness, one of its employés, who testified that on the Monday following the accident he saw plaintiff in the hospital, and that he asked the plaintiff how he was hurt, and plaintiff said he was walking by the side of the track, and stopped to light his pipe, and the wind blew him under. The defendant contended that the crew of the train consisted of but five men—the engineer, the fireman, the conductor, one brakeman, and a flagman. All these were called and sworn. All except Miller, the fireman, claim the train did not stop that night at Perkasie station, but passed at the rate, one says, of about 8 to 10 miles per hour along there. The engineer, fireman, and conductor say they were on the engine or tender, and that the brakeman was there also, as they passed Perkasie, and that the flagman was in the top of the caboose at the rear end of the train. They all say they did not see any one on the train except this crew, and did not push or kick any one off. The contention was and is that the plaintiff did not furnish any evidence that any employé of defendant on that train either pushed or kicked him off; that there is no evidence to sustain such a finding, or to justify the court in submitting the question to the jury. The evidence is that the trainman or brakeman and the flagman, who sometimes acted as brakeman, carried lanterns, and that both were on the train: that the rules of the company required the brakeman to be up on the top of the train—on top of the cars—when ascending or descending grades, and that this train at and on leaving Perkasie was on a heavy ascending grade; that in stormy weather he was permitted to go on the engine and warm; that this was a cold, but not a stormy, night; that the rules of the company also required him to put off any interloper or person stealing a ride; that Perkasie is a village of some 5,000 to 7,000 population. The plaintiff testified that after the train was in full motion some person walking on the top of that train, coming from the rear, ordered him off, and then kicked him off; that this person carried a lantern.

In the absence of proof to the contrary, the fair presumption is, and the jury would be justified in finding, that the brakeman, who carried a lantern, was on the top of the train, where his duty and the rules of the company required him to be. This was especially true in view of the evidence of the brakeman, his evasions and manner. There is no presumption that any interloper or stranger to the train was there with a lantern ordering the plaintiff off. Then was not the jury justified in finding that this brakeman was on the top of the train, and that he, seeing the plaintiff, an interloper, there, in the discharge of his duty as he understood it, and the train, accord-

ing to the story of the plaintiff, being but slowly in motion, and not having proceeded more than 500 feet, first ordered plaintiff off, and then, he not getting off, kicked or pushed him off? The evidence is that the train was then approaching a tunnel some 800 feet further north, and the jury might say or find that, being on the top of the train, where his duty required him to be, as he passed Perkasie station on this heavy up grade, this brakeman, on his way to the engine, to be there while passing the tunnel, or to warm, came across the plaintiff, and first ordered and then pushed him off, and then passed on to the engine, and that the fireman and conductor may have forgotten or may be mistaken as to just when he got there. This brakeman was not frank in all his statements. On the direct he was asked:

"Why are you, as the brakeman of a train, on the tank of the engine? A. My duties are any place my services are required. On the down grade they are required on the train, and on the upgrade—when you are going down a hill my services are required on a train, and when we get to the up grade I am no good out on a train. I certainly will not put on a brake. Q. Where do you go? A. I crawl up to the tank—up to the fireman—if necessary, shovel coal if it is needed."

On the cross-examination:

"Q. Let us see how fresh your recollection is as to the rules which are written? A. Yes, sir. Q. In print? A. Yes, sir. * * * Q. What do the rules say about your staying on top of the train? A. Why the rule is for a brakeman to do all possible, do anything. Q. Won't you answer the question, What do the rules say with reference to your staying on top of the train? A. Am I not giving it to you? Q. No; you are not, you are going to make a speech. Answer that question please. This is in print you know. A. The rule says that a brakeman will stay on the train ascending and descending grades. Q. Ascending and descending? A. Yes, sir. Q. That he shall stay on top of the train? A. Yes, sir. Q. And you were ascending a grade at this time? A. Yes, sir."

From this and other evidence, clearly the jury were not bound to believe his testimony. It is plain that the witness evaded as long as possible, admitting that if on the tender of the engine, where he claimed he was on leaving Perkasie, he was there in violation of the rules of the company.

It was a fair question of fact for the jury whether or not this brakeman kicked the plaintiff off the train when it was in motion at the place in question. The defendant excepted to the ruling of the court sustaining objections to certain questions put to Dr. Williams and to the witness Levi Texter. After the accident and the finding of the plaintiff he was taken into a freight car—one on a siding. Dr. Williams, the local physician of the defendant, was sent for, and he saw the plaintiff. He says:

"Part of one foot was cut off, and the other was cut off near the heel. It was smashed. * * * He was not unconscious at any time when I saw him. At no time. * * * It was a dangerous wound; if not attended to properly it would be fatal. He seemed to be suffering great pain. Q. Did you have any conversation direct with him yourself while he was there in the railroad station? A. I made an effort to, but I could not get anything out of him one way or the other for a long time, and the section hands, I

asked them to ask him, and he said something to them and he to them and they told me. Q. You did not talk to him directly yourself, did you? A. No, sir. Q. You cannot speak Italian? A. No, sir; the section hands were Italians. * * * Q. Then after you had asked this sectionman to ask the plaintiff that [how the accident happened], did the sectionman talk to the plaintiff in Italian? A. I do not know what he talked. He talked something. I cannot tell you what it was. He did not talk English, I know that. Q. He said something to him? A. Yes, sir. Q. Did the plaintiff say something to the sectionman after that? A. The sectionman; yes, sir. Q. Did the sectionman then say something to you? A. Yes. Q. What did the sectionman say to you? Was this in the presence of the plaintiff? A. Yes. Q. What did the sectionman say to you?"

This was objected to as incompetent, irrelevent, and immaterial, and plaintiff's counsel said: "I suppose the theory upon which it is offered is that this sectionman is supposed to have correctly interpreted what he told him." To this defendant's counsel by silence assented. The Court: "You mean there is no proof that the sectionman understood what was said to him?" Plaintiff's Counsel: "Yes." The Court: "Or that this man stated correctly what he said?" Plaintiff's Counsel: "Absolutely." The court then sustained the objection. Defendant's Counsel: "Do you admit that the plaintiff understood English to any extent?" Plaintiff's Counsel: "No, I do not know how much English he spoke." Defendant's counsel then excepted. At this time there was no evidence before the court that the plaintiff could speak or understand a word of English. The witness had failed to get any reply to his question. There was no error here. It appeared that the plaintiff was an Italian, and on the trial spoke but little English, and understood it with great difficulty. It was evident to the court that he did not and could not have understood what was said by the sectionman in English. On cross-examination this man asked the doctor:

"Q. And when you spoke in English to the man he evidently did not understand you; at all events he did not reply? A. I could not get anything out of him. Q. He did not reply when you spoke to him in English? A. I cannot say whether he said anything or not; but he did not say anything that was intelligent to me."

A. M. Sperry was then called by the defendant, and he said that on the Monday following the accident he went to the hospital, and talked with the plaintiff in English, and he understood plaintiff and plaintiff seemed to understand him. "I asked him first where he lived, and all about him, and he told me he worked in a stone crusher at Rock Hill, and he had been down to Perkasie, and was getting back, and walking up along the railroad, and he stopped to light his pipe, and the wind blew him under the train." Says his talk with the plaintiff was just long enough for him to tell him (witness) that.

Dr. Williams was then recalled, and said it took quite a while before they found out plaintiff's name the night of the injury. Defendant's counsel then said:

"I will now ask the question, What was the conversation between yourself and this sectionman after the plaintiff had spoken to the sectionman, as aforesaid?"

This was objected to, and the objection sustained, but no exception was taken.

Levi Texter was called. He said he was present when the doctor spoke to one of the sectionmen, and asked him to ask the plaintiff how the accident happened. "Q. After that did the plaintiff make any statement to this sectionman? A. Well, he said— Q. I do not want you to say, because the court is going to rule it out. Did this plaintiff then say something to the sectionman? A. Yes, sir. Q. In Italian? A. In a language that I did not understand what it was. Q. Immediately after this sectionman said something in English to the doctor? A. Yes, sir; he did. Q. What was it?" This was objected to. (To the court he then said he did not understand what the sectionman said to the plaintiff, or what the plaintiff said, if he said anything; took them for words.) "Q. Do you know they were words? A. A sound. Q. They made a sound, of course, but do you know that these sounds were words? A. No, sir; I could not say that. Q. Do you know any Italian? A. No, sir: I do not." The court then sustained the objection. These Italian sectionmen were not produced. Their absence was attempted to be accounted for by the statement of a witness that they left the employment of defendant in July after the accident, stating they were going to Italy.

It is now claimed that it was error to reject the statement of the sectionman made to Dr. Williams in the presence of the plaintiff when he lay in the condition described, and under the circumstances described, as his silence might be considered as an acquiescence in that statement. It is not everything that is said in the presence of a party to a litigation in reference to the subject-matter thereof that may be given in evidence against him when he remains silent, and his silence is relied upon as an implied admission of the truth or correctness of the statement. If the party in whose presence the statement was made was physically and mentally able to hear and understand, and sufficiently near to hear, and the statement was of a character that would under the circumstances naturally call upon him for a denial or qualification if untrue, and he was at liberty to deny or qualify, then it may be given in evidence against him; otherwise, not. Schilling v. Union R. Co. of N. Y. C., 77 App. Div. 74, 78 N. Y. Supp. 1015; Commonwealth v. Kenney, 12 Metc. (Mass.) 235–237, 46 Am. Dec. 672; People v. Koerner, 154 N. Y. 357, 374, 375, 48 N. E. 730; Lanergan v. People, 39 N. Y. 41; 1 Greenleaf on Evidence (15th Ed.) § 197; 2 Wigmore on Evidence, § 1071; La Bau v. Vanderbilt, 3 Redf. Sur. 384; 1 Elliott on Evidence, §§ 221, 230, 231. Evidence of this kind must always be received with caution. Corser v. Paul, 41 N. H. 24, 77 Am. Dec. 753. Whether the circumstances are such as to call for a reply is a preliminary question for the court. Pierce's Adm'r v. Pierce, 66 Vt. 369, 29 Atl. 364; People v. Mallon, 103 Cal. 513, 514, 37 Pac. 512; Schilling v. Union Railway Co., 77 App. Div. 77, 78 N. Y. Supp. 1015.

In Schilling v. Union Railway Company, 77 App. Div. 74, 78 N. Y. Supp. 1015, the court held:

"In an action to recover damages for personal injuries, a hospital surgeon, who went to the plaintiff's house with an ambulance to take her to the hospital, and found her lying upon a couch seriously injured and suffering from shock, but not unconscious, should not be allowed to testify to statements made in the plaintiff's presence concerning the manner in which the accident happened, and to which the plaintiff made no reply, unless it appears that at the time such statement was made the plaintiff was cognizant of what was said, and was in a condition to understand and appreciate it."

In Lanergan v. People, 39 N. Y. 39, the court held:

"A conversation between witness and prisoner's wife, to be competent evidence against the prisoner, must have taken place in his immediate presence and hearing."

And at page 41 the learned court said (all concurring):

"That conversation could be evidence only on the theory that it took place in the presence of the accused, and that not merely in his bodily presence, but in his hearing and understanding."

In Greenleaf on Evidence, vol. 1 (15th Ed.) § 197, the rule is thus stated:

"But acquiescence, to have the effect of an admission, must exhibit some act of the mind, and amount to voluntary demeanor or conduct of the party. And whether it is acquiescence in the conduct or in the language of others, it must plainly appear that such conduct was fully known, or the language fully understood, by the party, before any inference can be drawn from his passiveness or silence. The circumstances, too, must be not only such as afforded him an opportunity to act or to speak, but such, also, as would properly and naturally call for some action or reply from men similarly situated."

In People v. Koerner, 154 N. Y. 357, 48 N. E. 730, the court held:

"(12) Statement by another in presence of party—Admission by acquiescence—Silence. A party's acquiescence in the statement of another, made in his presence, to have the effect of an admission, must exhibit some act of voluntary demeanor or conduct; it must plainly appear that such statement was fully known and understood by the party before any inference can be drawn from his passiveness or silence, and the circumstances must not only be such as afforded him an opportunity to act or speak, but also such as would properly or naturally call for some action or reply from men similarly situated.

"(13) Statement made in presence of apparently unconscious defendant— Erroneous admission in evidence—Reversible error. On a trial for murder, in which defect of reason at the time of the act was interposed as a defense, a witness for the prosecution, who had testified as a medical expert that in his opinion the defendant was "shamming", when apparently unconscious immediately after the homicide, was permitted to testify, over the defendant's objection, that he stated to a police officer, in the presence of the defendant and while the latter was apparently unconscious, that he 'didn't see there was very much the matter with the man; that he was probably faking.' Held, that the evidence was incompetent and improper, being merely hearsay, or the statement of a witness to a third party, unless made under such circumstances as to be binding upon the defendant; that the silence of the defendant, under the circumstances, did not raise a presumption of acquiescence in the witness's remark so as to render it competent as an admission; and that the ruling admitting the statement in evidence constituted a harmful error, calling for a reversal."

At pages 374 and 375 of 154 N. Y., at page 736 of 48 N. E., the learned court said:

"A party's acquiescence, to have the effect of an admission, must exhibit some act of voluntary demeanor or conduct. When the claimed acquiescence is in the conduct or in the language of others, it must plainly appear that such conduct or language was fully known and fully understood by the party before any inference can be drawn from his passiveness or silence. Moreover, the circumstances must not only be such as afforded him an opportunity to act or to speak, but also such as would properly or naturally call for some action or reply from men similarly situated. Declarations or statements made in the presence of a party are received in evidence, not as evidence in themselves, but to ascertain what reply the party to be affected makes to them. If he is silent when he ought to have denied, the presumption of acquiescence arises. But it is clearly otherwise when his silence is of a character which does not justify such an inference. Thus, when a person is asleep, or intoxicated, or deaf, or a foreigner unable to understand the language employed, he cannot be prejudiced by statements made by others in his presence. Nor is such silence an assent, unless the statements were such as to properly call for a response. The rule in regard to admissions inferred from acquiescence in the verbal statements of others is to be applied with careful discrimination. As was said by Best, C. J., in Child v. Grace, 2 C. & P. 193: 'Really, it is most dangerous evidence.' It should always be received with caution, and ought not to be admitted unless the evidence is of direct declarations of a kind which naturally call for contradiction, or some assertion made to a party with respect to his rights, in which, by silence, he acquiesces."

In Commonwealth v. Kenney, 53 Mass. 237, 46 Am. Dec. 672, Chief Justice Shaw said:

"In some cases, where a similar declaration is made in one's hearing, and he makes no reply, it may be a tacit admission of the facts. But this depends on two facts—first, whether he hears and understands the statement and comprehends its bearing; and, secondly, whether the truth of the facts embraced in the statement is within his own knowledge or not; whether he is in such a situation that he is at liberty to make any reply; and whether the statement is made under such circumstances, and by such persons, as naturally to call for a reply, if he did not intend to admit it."

In Elliott on Evidence, vol. 1, § 221, it is said:

"But in order that admissions may be inferred from silence or acquiescence it must usually appear that the language or the conduct in question was known and understood by the party claimed to have acquiesced therein, and that he was naturally called upon to take some action or make some response thereto. Such evidence should be received with caution."

See, also, Whitney v. Houghton, 127 Mass. 527. Says Elliott, citing this Whitney Case:

"So it may be stated generally that when the circumstances are such that no reasonable inference of acquiescence can be drawn from the silence of a party, the statements should not be received as admissions."

Applying these rules to the case now before the court, it is evident that the statement made by the sectionman, whose ability to understand English and whose plainness of speech in English were not disclosed, under the circumstances of this case was not proper to go to the jury, and was properly excluded. Within a very short time before the statement was made in his presence both feet had been crushed off. The shock was great, and he was exhausted from great pain and loss of blood. The doctor was unable to get anything from him. It was with great difficulty and only after repeated efforts that they ascertained his name. There was no shadow of evidence

that he heard or paid any attention to what this sectionman said to the doctor. Clearly, "no reasonable inference of acquiescence could be drawn from the silence" of the plaintiff under the circumstances proved by the witnesses and not disputed. Under such circumstances, it cannot be properly presumed or inferred, or even reasonably supposed, that he listened or paid attention to, much less understood or comprehended, what was said to the doctor by this Italian laborer, who soon thereafter left for Italy, assuming he did, and whose knowledge of and ability to speak English must have been imperfect. If the plaintiff could not understand the English of the doctor, is it reasonable to suppose he understood that of this Italian sectionman, who was speaking to the doctor and not to him? The case is within and governed by the Schilling Case and the Koerner Case cited, as well as by the general rule laid down by Greenleaf and Elliott, supra.

In Wright v. Maseras, 56 Barb. (N. Y.) 521, the facts are different. That case was before the justice without a jury, and the defendant showed by his actions in taking out his money and showing it that he understood what was said. Here the case is barren of any fact or act indicating in the remotest degree that Parulo heard or understood what the sectionman said. It was not for the jury to hear the evidence, and then guess or speculate that plaintiff might have heard it and acquiesced. In no event was it evidence of itself, but only permissible to ascertain what reply the plaintiff ought to have made. Under the circumstances, he was not called upon to enter into a discussion with the sectionman as to the correctness of his statements to the doctor, which in all human probability he did not hear.

The defendant's counsel excepted to that part of the judge's charge in which he said:

"But, gentlemen, the determination of this case does not rest necessarily upon the question whether or not that train stopped there. It may have so slowed up that the plaintiff, thinking it was at a standstill, or substantially so, in view of his subsequent injuries, in view of his pain and suffering, not only there at the station where he was injured, but later on in the hospital, may have forgotten, and he may have got onto it when it was slowed down, and he may honestly now believe and testify honestly that it was at a standstill. It is not necessary, to make him fail in this case, to brand him as a perjurer, because he may think that the train did absolutely stop; but it is very important evidence as bearing on the question of how he received his injuries, and when, and on the question whether or not he got onto that train down there at the depot, or whether he was attempting to get onto it up above the depot, or was there walking by the side of it, and was drawn under in some way. All that is for your consideration and for your thought."

On the taking that exception the court said:

"The Court: I say that it is the duty of a jury always, taking all the evidence and all the circumstances and surroundings. to reconcile the evidence if you can consistently with the truthfulness of all the witnesses. If you cannot do that, then, of course, you must find who speaks falsely and who speaks the truth. It is your duty first to reconcile it if you can; so that you would be warranted in finding in this case that this train did not come to a full dead stop, but that it so slowed down that the plaintiff was able to safely gain a seat on the train, and that, in view of his subsequent injuries and pain and suffering and the lapse of time, he may have forgotten that it was slowly in motion, and he may now honestly believe that it came to a full stop when it did not; and to that I give you an exception."

I can discover no error in the charge as given on this subject. The plaintiff testified the train was at a standstill when he got on, and moved on almost immediately thereafter; while those on the train in charge of it, excepting the fireman, Miller, testified it did not stop. The station agent, Arn, said he could not remember or tell whether it did or not stop without his record; that his duty was to record the arrival and departure of trains, and his record showed that this train passed, but did not show that it stopped. He said that this train stopped at Perkasie sometimes, but not usually: that a representative of plaintiff's attorney came to him some time after the accident, and that he told him it did stop at Perkasie on the night in question. He also testified that at that time it was his recollection that this train did stop at Perkasie that night, and he had in mind the occasion in question. The fireman, who was on the tender of the engine, had no recollection on the subject. There was evidence it would stop for water if water was needed. More than three years had elapsed since the accident when these witnesses testified. Perkasie was quite a large town, and this was an up grade. The plaintiff was severely and dangerously injured that night, and suffered great pain. It is not unreasonable, but in fact reasonable and quite probable, that by reason of his pain and suffering and the events of the night his recollection as to the stopping of the train had become somewhat confused. But he could not be mistaken about actually getting thereon. Either the plaintiff was mistaken, or some of defendant's witnesses were honestly mistaken, or plaintiff or these witnesses, or some one or more, deliberately committed perjury. The train may have stopped for a few seconds, and defendant's witnesses may have forgotten the fact, and they may have been honest in saying it did not stop, or they may be mistaken as to its speed if it did not stop. It may have been moving very slowly, and plaintiff's honest recollection may be that it absolutely stopped. If moving slowly, plaintiff could have gotten on easily. This is not a case where getting on the train was impossible unless the train stopped. The jury was not compelled to find it stopped in order to find that plaintiff was seated safely on the car, or that it did not stop, and hence plaintiff could not recover as he could not have been on the train. The court more than once repeated that the evidence as to the train stopping was very important. It was the duty of the jury to reconcile the evidence of all the witnesses consistently with the truthfulness of all, if it could be done reasonably. The court had the right so to say. Blashfield, Instructions to Juries, § 270; Sackett, Instructions to Juries, p. 32.

The defendant's counsel then requested the court to charge "that there is no evidence in the case that there were more than five employés on the train, and those five have been produced in court." The court said:

"That is so, but somebody else may have gotten on the train. You have a right to consider that. Somebody else may have gotten on the train and kicked him off. But you have got to find and there must be evidence that it was some employé of the defendant acting within the general scope of his authority that kicked him off, or else the defendant is not liable. Of course, if the jury believe

that somebody else got on the train, and came along there and kicked him off, and it was not one of the servants of the defendant acting within the general scope of his authority—that is, having the right to be on that train and engaged in working the train and managing it—even if it was an employé of the company—if you believe that, then, of course, it will be your duty to find for the defendant."

The court not only charged the exact request of the defendant's counsel, but pointed out explicitly that some one else—that is, some one not a member of the crew of five on the train, who were produced in court—might have got on the train and kicked the plaintiff off. The court also stated that if such a person got on the train and kicked plaintiff off, and such person was an employé of the defendant, the defendant was not liable unless such person had the right to be on the train, and was engaged in working and managing the train, and also explicitly stated there must be evidence of that fact. All this was in the interest of the defendant, and intended to be, and followed the direct instruction that there was no evidence in the case that there were more than five employés on the train, and that they had been produced in court. These five comprised the crew, composed of employés of the defendant, engaged in working and managing the train. This instruction was tantamount to saying that one of the five must have kicked plaintiff off, and the charge before that had limited this number to the conductor and brakeman. The court had expressly charged, and no exception was taken to it, that:

"As the plaintiff was on the freight train of the defendant, if there without invitation or right to be and remain there, was not a passenger, but, as the phrase goes, was stealing a ride, his only right was not to be injured by the willful, wanton, or reckless acts of the defendant or of its agents or servants; and the only duty of the defendant to him was not to injure him by positive intentional act, or by willful, reckless, or wanton acts; that is, not to willfully, wantonly, or recklessly injure him. The defendant had the right to remove the plaintiff by the use of all necessary force after ordering him off, in case he refused to go, on stopping the train at a reasonably safe place, but it had no right to remove him while the train was in motion by actual force or by threats of violence. Actual force applied to remove the plaintiff, or threats of personal violence made to cause him to jump off, while the train was in such rapid motion as to make getting off obviously dangerous, if such threats were made, under such circumstances and conditions as to show a purpose and an ability to execute them, would constitute willful or wanton or reckless acts. But the defendant would not be liable for such an act, or the consequences of it, if it resulted in injury to the plaintiff, unless it was done by some agent or servant of the defendant on or about the train or road being run by the defendant, and having at the time some duty to perform to the defendant, and when such servant or agent was engaged in the performance or discharge of some express or implied duty to the defendant, and was acting within the general scope of his employment and duty. That is, gentlemen, if the plaintiff was there, and if some agent or servant pushed him or kicked him off, that agent or servant must at the time have been engaged in the performance of some duty, not in doing that particular act, but must have been engaged on the train in the performance of his general duties, and he must have had it in his mind that he had a duty to perform to the defendant in putting the plaintiff off, and he must have put him off in the supposition, or having it in mind, that he was carrying out the orders of his master in putting him off; not the mode or manner, not that that was within his mind, that he was ordered to do it in that manner, but that it was his duty to put him off the train, so that he was acting within the general scope of his employment and his duty. If the plaintiff was pushed,

or kicked, or driven from this car in question, having gained a seat thereon, while and when it was in motion, such as to make it dangerous to get off, on the evening in question, by some servant, agent, or employé of the defendant, and that agent, servant, or employé was on that train in the employ of the defendant, and acting generally in the discharge of some express or implied duty to the defendant, and was engaged in the execution of some express or implied authority in performing such duties to the defendant, and was acting within the general scope of his employment or authority, and had that in mind in doing what he did, then defendant is liable for the immediate results and consequent damage to the plaintiff. But if the act mentioned was done by some agent or servant or employé of defendant who was temporarily on the train, and who had no duty there, express or implied, as to interlopers or trespassers, or by some agent, servant, or employé of the defendant who went outside of his general employment or duty and the general scope of his employment, and did the act or acts to gratify or serve some spite, malice, or ill will or purpose of his own, then the defendant is not liable. The evidence here is that the trainman or brakeman had orders and it was his duty to remove trespassers on the train—persons stealing a ride. The conductor of a freight train and trainmen thereon engaged in running it have an implied authority to expel or remove therefrom persons stealing rides thereon, not intending to pay fare, in the absence of rules or instructions requiring it; but in doing this, they must not use unnecessary or excessive force, or do it at dangerous places or at dangerous times, such as when the train is in motion, so as to render such removal or getting from the train obviously dangerous. They may not act recklessly or wantonly in making such removal, or expose the person removed or driven off to unnecessary peril or danger. If they do that while they are acting within the general scope of their employment in putting off or driving off trespassers and wrongdoers, then as they are acting in the line of their duty, within the general scope of their authority, and have it in mind to serve the master, then the master is liable for such wrong or such excessive force. But if they go outside of that entirely, I repeat, to gratify some malice or spite or ill will of their own—to serve some purpose of their own—then the railroad company would not be liable."

The plaintiff had proved, without objection or exception, by the witness, Cohen, that Arn, the station agent, stated to him that on this train on the night in question there was a green or extra brakeman. The defendant's counsel, immediately following the charge expressly made as requested, that "there is no evidence in the case that there were more than five employés upon the train, and those five have been produced in court," and following the suggestion made by plaintiff's counsel that the brakeman testified that nobody else with a lantern got on the train, and the statement of the court, "the jury will determine," said:

"There has been some statement by my friend about an unknown employé. I now ask your honor to charge that there is no evidence in the case that there were more than five employés on the train, and those five have been produced in court."

This was but an exact repetition of the request just made and complied with without limitation, and the court was not bound to repeat it, and did not refuse to so charge, but had so charged.

The court said:

"The witness says that, when he went down there and made these inquiries, the station agent there said that there was a green brakeman on the train, and that the company had been looking for him, and had been unable to find him. Defendant's Counsel: Yes. The Court: He said that; was it true? Defendant's Counsel: I except to your honor's refusal to charge as requested. The Court: "There is no positive evidence here that there was anybody else on that

train. The conductor, the fireman, the brakeman, the flagman, all swear that there was nobody else on that train that night. But you have here that statement, and that is contradicted. You can take it for what it is worth."

Defendant's counsel excepted. This all related to the mere possible presence of some other person on that train that night. But there was no evidence this person had any duty there, or was engaged in running the train, as the court but a moment before had said there must be. In view of the prior charge it could not have been prejudicial to the defendant.

The defendant's counsel insisted on the trial and insists now that under the evidence the jury were justified in finding that plaintiff was kicked off, but that it was done by some person who got on the train, but who had no duty to perform there, and hence was not acting within the scope of his employment in doing what he did. The defendant's counsel now says:

"Aside from what was said in argument upon the trial, it is not incredible or impossible but that some stranger, tramp, or quarry foreman might have gotten on this train with a lantern, and from motives of sheer spite, or desiring to pose with the authority of an employé, have kicked the plaintiff off."

With the evidence before the jury unobjected to, and with no motion to strike it out or request that the jury be instructed to disregard it, that the station agent asserted the presence of a green brakeman on that train that night, not, however, as a part of the crew, the court more than once emphasized the fact that to make the defendant liable the person who kicked plaintiff off, if he was kicked off, must have been not only an employé, but an employé of defendant on that train, having a duty to perform there, and engaged in running it, and acting at the time in the discharge of a duty to the company, and having the discharge or performance of that duty in mind, and that there must be evidence to that effect. The defendant's counsel asked the court to charge "that the plaintiff is an interested witness, and the jury are not bound to believe his testimony unless corroborated by other evidence." The court said in response:

"The Court: You are not bound to believe it, even if it is corroborated. So with the defendant's witnesses. You are not bound to believe it. When a witness comes before a court and jury, and he is entirely disinterested, and he knows whereof he speaks, and his manner and his statements are fair and candid, and he is not impeached in any way or contradicted, and there are no inherent improbabilities in his story, then it is the duty of the jury to believe him. But if he is interested, if his manner is such that you do not put confidence in him, such as indicates that he is telling a falsehood, or if his story, in view of all the conceded and known facts, is improbable, either plainly so or because of inherent contradictions is improbable, then the jury have a right to disregard it, and if it is sufficiently improbable you ought to disregard it. All that appeals to your common sense and experience."

The charge made was more favorable than requested.

The defendant's counsel also requested the court to charge:

"That the jury are the sole judges of the facts, and that they are not to substitute for their own judgment as to the facts any comment on the testimony made by the judge presiding." The Court: "I decline to charge any differently from what I have charged."

While no point is raised now on this refusal, it is proper to say that in the sentences immediately preceding this request the court had said to the jury:

"You should take the evidence of the witnesses—take them altogether—and determine how the fact is. It is a fact for you to find whether the train stopped, and it is for your determination—all these questions of fact, the credibility of the witnesses—it is all for you."

And but a moment after this request the court said:

"In fact you will consider all the facts and all circumstances attending the transaction, and all the statements of the witnesses, and determine who tells the truth and what the truth is. It is for you, gentlemen."

And early in the charge:

"I am going over this evidence briefly, so that you will have it in mind. If I do not state it exactly as you remember it, you are the judges of the fact, and you will correct me. I am only doing it in a general way, so that you will understand the issue and the law applicable, and not with any intention or purpose of directing what your verdict shall be, or influencing you in any way in that regard."

As the court had repeatedly told the jury they were the judges of the facts, that the facts were for them, and that if in referring to the evidence the court differed from the recollection of the jury the memory of the jury must control, and that the court had no intention or purpose of influencing the jury in any way, it was not called upon to charge further on that subject. The court carefully refrained from expressing any opinion as to the weight or sufficiency of the evidence, but left all questions of fact to the jury. There was no error in refusing to charge differently than the court had charged. Rucker v. Wheeler, 127 U. S. 85, 8 Sup. Ct. 1142, 32 L. Ed. 102; Doyle v. Union Pacific R. Co., 147 U. S. 413, 13 Sup. Ct. 333, 37 L. Ed. 223; U. S. v. Philadelphia & Reading R. Co., 123 U. S. 113, 8 Sup. Ct. 77, 31 L. Ed. 138; Vicksburg & M. R. Co. v. Putnam, 118 U. S. 545, 7 Sup. Ct. 1, 30 L. Ed. 257; Doyle v. Boston & Albany R. Co., 82 Fed. 869, 27 C. C. A. 264.

The court was not requested to instruct the jury to disregard the evidence of the witness Cohen as to the statement made by the depot agent, and hence the court committed no error in failing to do that. Marks v. King, 64 N. Y. 628; Gawtry v. Doane, 51 N. Y. 84.

In Marks v. King, supra, the rule is stated:

"Evidence admitted upon a trial by jury, either without an objection or properly under objection, which for any reason should not be considered by the jury, is not necessarily to be stricken out on motion, but may be retained in the discretion of the court. The remedy of the party is to ask for instructions to the jury that they disregard it."

The rule of law as to plaintiff's liability for the willful or reckless acts of its brakeman or other servants, if they were guilty of any on the occasion in question, was correctly stated. Girvin v. N. Y. C. & H. R. Co., 166 N. Y. 289, 59 N. E. 921; Mott v. Consumers' Ice Co., 73 N. Y. 543; Ansteth v. Buffalo R. Co., 145 N. Y. 210, 39 N. E. 708, 45 Am. St. Rep. 607; Leonard v. Boston & Albany R. Co., 170 Mass. 318, 49 N. E. 621; Planz v. Boston & Albany R. Co., 157 Mass.

377, 32 N. E. 356, 17 L. R. A. 835; West Jersey & S. R. Co. v. Welsh, 62 N. J. Law, 655, 42 Atl. 736, 72 Am. St. Rep. 659; O'Banion v. M. P. R. Co., 65 Kan. 352, 69 Pac. 353.

The attention of the jury was directed to all the claims of the defendant, and generally to all of its evidence, and it was explicitly charged that because of the interest of the plaintiff the jury was not bound to believe his testimony even if he was corroborated. They were expressly cautioned against being affected by sympathy for the plaintiff or prejudice against the defendant because it was a railroad corporation. In fact the plaintiff's counsel had not appealed to the sympathies of the jury, or made any effort to excite the prejudice or passion of the jury. The defendant's defenses were more than once pressed upon the attention of the jury, and given equally as great, if not greater, prominence than was the plaintiff's contention. The jury was also told that negligence could not be presumed, but must be proved to the satisfaction of the jury by a fair preponderance of evidence, and that the plaintiff must have proved his case by a fair preponderance of evidence or the defendant was entitled to a verdict. The trial was had before a fair and impartial and very intelligent jury, and there was no suspicion that it was influenced by anything except the evidence and the rules of law laid down by the court.

Taking the evidence altogether, the plaintiff, who was fair and candid in his manner and statements, sustained his case by a fair preponderance of legal evidence, and, as there was no prejudicial error, the motion for a new trial is denied.