No. 19,245.

WILLIAM SIPULT, *Appellee,* v. THE WILSON LAND AND GRAIN COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. ASSAULT—*Damages—Jurisdiction Obtained by Attachment.* In an action for damages for an assault by its agent, a foreign corporation owning property here may be proceeded against by attachment and publication service, a summons having been returned unserved.

2. SAME—*Assault by Agent—Within Scope of Agent's Authority.* The plaintiff's theory was that the defendant land company's agent planned and participated in an assault upon him as a means to put another lessee of a tract of the defendant's land in possession. On such assumption the company would be liable if the testimony fairly showed that the agent was doing what his principal had employed him to do,

Sipult v. Land and Grain Co.

and was acting in the line and course of his employment and for the benefit of his principal, and not in the accomplishment of some purpose of his own, although acting in a wrongful manner.

3. ARREST—*Warrant—Duty of Officer—Instructions.* The testimony was such that the jury had to determine whether the assault was committed in an effort in good faith to assist a constable in arresting the plaintiff upon a warrant in his hands or whether such warrant was used as a cover and excuse for forcibly putting one of the persons deputized by such officer in possession of the land occupied by the plaintiff. Touching the duty of an arresting officer and the rights of the one sought to be apprehended, the court charged the jury in substantial accord with sections 129 to 132 of the criminal code. *Held,* proper.

4. SPECIAL FINDINGS—*Judgment.* When the special findings are not in substance or effect inconsistent with the general verdict, a judgment on such findings can not be ordered.

Appeal from Sedgwick district court, division No. 1; THOMAS C. WILSON, judge. Opinion filed February 6, 1915. Affirmed.

*Earl Blake, W. A. Ayres, Walter A. Blake,* and *C. A. McCorkle,* all of Wichita, for the appellant.

*John W. Adams,* and *George W. Adams,* both of Wichita, for the appellee.

The opinion of the court was delivered by

WEST, J.: On the 21st day of July, 1911, R. W. Wilson, an agent for the defendant company, was upon the land which the plaintiff for a number of years had rented of the company and occupied. An altercation ensued, and Wilson procured the issuance of a warrant from a justice of the peace for the arrest of the plaintiff. The next day the constable and Wilson with a number of other men went upon the place ostensibly for the purpose of arresting the plaintiff, certain of the others referred to being deputized by the constable to assist in making the arrest. They were all ordered off the place by the plaintiff, who claimed under a written

lease and also under an oral lease. One of the others who had been deputized claimed the right of possession by virtue of a written lease, and came with a steam plow and some hands and proceeded to put the plow at work. The constable claims to have told the plaintiff that he had a warrant for his arrest. The plaintiff claims that all the constable said was that he had papers or paper for him which plaintiff understood meant a lease. A general fight ensued, during which the plaintiff was shot at a number of times and seriously wounded twice. He sued the defendant company, alleging that its agent, R. W. Wilson, brought the other men for the purpose of forcibly ejecting the plaintiff, and that they were all trespassers when the shooting occurred. The plaintiff recovered, and the defendant appeals and urges error in overruling the motion to quash the service by publication and to discharge the attachment, in certain other rulings, in certain instructions, and in the refusal to hold that the acts of Wilson were outside the scope of his employment. Complaint is also made that the charge of conspiracy was not sustained by the proof, and that error was committed in overruling a motion for judgment on the special findings.

The action was one in which an attachment would lie, and hence the first complaint is without merit. (*Cain v. Perfect,* 89 Kan. 361, 131 Pac. 573.)

As to the question of the authority of the agent, the record shows that his duties were to rent the company's land and collect rents in the neighborhood where the plaintiff lived; that the headquarters of the company were at Arcade, N. Y.; that it is a New York corporation and had sixteen or eighteen hundred acres of land in the locality rented by the plaintiff, and maintained an office at Anness in the vicinity occupied by the agent in question. Another Mr. Wilson, who was general manager, secretary and treasurer, testified that the local agent was authorized to rent land and collect the rents and look after the land to

that extent. The plaintiff testified that during the years he had been on the land his dealings were with the agent in question, who received the rent and came out when the grain was threshed. O'Brian, who claimed the right of possession under a written lease, testified that the agent Wilson ordered him to go upon the land, and that he claimed the right to go there under the lease. The constable and O'Brian both shot several times, and it was testified that after the latter had emptied his revolver he remarked that he was out of ammunition and agent Wilson directed him to take a team and go for some more, which he promptly did. It appeared that when the first lease was drawn the general manager Wilson from New York and the local agent Wilson were together at the plaintiff's house. One witness testified that he was working for O'Brian, running an engine for a thresher; that on July 21 he took the engine to a Mr. Harrison's place, O'Brian and a man named Burke being on the engine; that that night they did a lot of work on the plow; that he arose at 3:30 the next morning, at O'Brian's instructions, and went to Anness to get the plowshares, and they were fastened on, and about seven o'clock they started for the Wilson land as instructed by O'Brian who told him to hurry up and get up as quick as he could; that they cut across the field towards the Wilson land, arriving there about 9:30; that R. W. Wilson drove up to the Harrison place and inquired for O'Brian about seven that morning, and afterwards went towards O'Brian's, and the witness met him in company with the constable about a quarter of a mile south of the Wilson land later in the morning; that O'Brian stayed along with the plow and Wilson and Armstrong went back with the witness to the Wilson land. When they got to the Wilson land Wilson told O'Brian to go ahead and plow and he would stand behind him if anything was done; that when the plaintiff appeared O'Brian said: "You fellows take care of the old lady and I will handle the old man," and

the plow started; that when the plaintiff came up O'Brian said: "Get ready for battle"; that when O'Brian returned with the gun he had been directed by Wilson to go after he laid it on the plow and remarked that he could hit the plaintiff with that; that during the time he was gone the plaintiff, the constable, young O'Brian, the witness, Snyder and two others remained with the plow and that Wilson, who was standing around the plow remarked that "we would not plow there until after they seen how the trial come out"; that the constable did not tell Sipult he had a warrant. Another witness testified that there was an office at Anness with a sign bearing the defendant's name, and that the agent, Robert W. Wilson, acted for the company, leased land and looked after its interests and was seen around where they were threshing and took care of the crops in that vicinity for three years; that he was the only representative of the company there unless it was the Mr. Wilson of Arcade, N. Y., who had been out there once. The constable testified that Robert W. Wilson came to his house about seven o'clock of the morning of the 22d and placed the warrant in his hands. "I knew he had a horse and buggy and I deputized him right on the spot, and asked him to take me out." The testimony showed that on the 14th day of August, 1911, the defendant company, by Robert W. Wilson, foreman and agent, filed a complaint in forcible detention against the plaintiff. It does not appear that the warrant heretofore spoken of was ever served.

Without going into other matters testified to, which the jury apparently believed, and without stopping to consider conflicting and contradictory evidence the record is abundantly sufficient to warrant the jury in finding an agency on the part of Robert W. Wilson to put O'Brian in possession as lessee and put the plaintiff out of possession, and that in making the attempt so to do he was acting within the scope of his authority. Having taken the wrong means and having proceeded in

the wrong course to accomplish his object, it remains
to be determined whether or not the company for
whom he acted must be held responsible. While ordi-
narily the mere procuring of a warrant really intended
for the apprehension of the plaintiff for the unnamed
offense of the day before might not of itself have been
within the scope of his agency, another situation is
presented if it appears that such warrant was used
and intended merely as a cover and excuse for the
violent ouster of the person apparently sought to be
arrested. If the brief reference to the evidence al-
ready made is not sufficient the record contains ample
to justify the jury in believing that the entire scheme
of forcibly putting O'Brian in possession and forcibly
putting the plaintiff out was devised, manned and man-
aged by the company's agent, in all of which he was
not acting for himself but for his principal.

The dividing line between authorized and unau-
thorized acts and those within and those without the
scope of employment is often difficult to locate, but
a . workable approximation is made possible by the
former decisions of this court. In *Hudson v. M. K.
& T. Rly. Co.*, 16 Kan. 470, it appears that while
Hudson was at the depot, after freight consigned to
certain persons for whom he was acting, he was as-
saulted by the railway company's agent. Upon the
question of the liability of the company it was said:

"Was Trotter acting in the course of his employ-
ment in making the assault? For it does not appear
that it was a part of his employment, that is, that he
was employed directly to make the assault. Was it
in the line of his duty, and growing out of the serv-
ices he was employed to perform? He was as it ap-
pears in charge of the company's depot. As such it
was his duty to remove therefrom all persons im-
properly there, or improperly conducting themselves,
though otherwise lawfully there. If in the supposed
performance of this duty, and in ejecting plaintiff
from the depot, he had improperly ejected him, or had
used unnecessary force in ejecting him, the company

would have been liable, because he was doing that which the company had employed him to do, acting in the very line and course of his employment, and any mistake or violence on his part was the mistake or violence of his principal, the company." (p. 473.)

It is fair to say that Wilson was doing that which the company had employed him to do, and acting in the line and course of his employment in putting the company's lessee in possession of the land or in putting its former lessee, Sipult, off, and "any mistake or violence on his part was the mistake or violence of his principal, the company." Later in the Hudson opinion, it was pointed out that the assault was not in the course of the agent's employment and was clearly disconnected therefrom and a mere volunteer assault.

"True, the employment may have given the opportunity and occasion, but it was not an act which in any fair sense the company could have been said to have employed him to do, or to have anticipated that he would do, nor an act which was the act of the company." (p. 474.)

Here the testimony expressly shows that Wilson was authorized to rent the land and collect the proceeds; that he had for several years looked after the large body of land in the vicinity owned by his principal, and that he was in charge of the company's office at Anness. These things, considered in connection with the further fact that he seems to have been the only man this side of Arcade, N. Y., who had spoken or acted for years, or who could speak or act with reference to the land, save when the officer from the east happened to be on a visit to the office or property, are ample ground for the fair inference and belief that in seeking to seat one lessee and unseat another he was acting for the company, precisely as he was when a month later he made complaint against Sipult in forcible detention for the purpose of getting him off the land by orderly and lawful means. In *Wheeler & Wilson Mfg. Co. v. Boyce,* 36 Kan. 350,

13 Pac. 609, it was held that a corporation is respon-
sible for the tortious acts of its general agent in the
line of its employment and in the exercise of the
authority conferred, although not previously author-
izing nor subsequently ratifying such acts. A general
agent of the company caused the arrest of certain
parties on the pretense that they had refused to de-
liver a machine which had been purchased by the wife,
and on which a balance was claimed to be due. The
company denied liability, but it was held that its gen-
eral agent had not only authority to sell machines and
collect money therefor but to institute legal proceed-
ings to recover possession of machines in the condi-
tion when sold and for which payment had not been
made in accordance with the terms of the sale.

"The arrest and detention of Boyce was incidental to
the replevin action, and was made as alleged to compel
the delivery of the machine. . . . He had full au-
thority to represent the company, and whatever was
done by him was done for the benefit of the company
and for the accomplishment of its purpose. His act,
although wrongful, was in the line of his employment,
was done in the execution of the authority conferred
upon him, and must be regarded as the act of the com-
pany." (p. 354.)

In *Laird v. Farwell*, 60 Kan. 512, 57 Pac. 98, a chat-
tel mortgagee in possession of a stock of goods em-
ployed an agent to take charge and sell and account.
He was held not liable for the acts of such agent in
causing the arrest of a person for perjury in making
an attachment affidavit in an action wherein some of
the goods were taken from the agent, such arrest not
being within the scope of the employment. In *O'Banion
v. Railway Co.*, 65 Kan. 352, 69 Pac. 353, it was
held to be for the jury to determine whether a brake-
man who forcibly ejected a trespasser did so in the
discharge of his duty or for the purpose of extorting
money. In the opinion it was said that he owed the
duty to his employer to remove trespassers, and if "in
the discharge of such duty, he recklessly or in a willful,

wanton or malicious manner performed it, and ejected a trespasser in a way to cause bodily injury, the railway company was liable for his acts." (p. 357.)  Section 615 of volume 1 of Thompson's Commentaries on the Law of Negligence was quoted, to the effect that it was a question for the jury whether at the time of the particular act which caused the injury the agent was acting "within the scope of his employment, or acting outside of it to effect some purpose of his own." (p. 358.)  In *Crelly v. Telephone Co.*, 84 Kan. 19, 113 Pac. 386, in holding that the assault by the local manager was not within the scope of his employment, it was said:

"In this case the use of force did not pertain to the business intrusted to Casen by the company. It was not an incident of the authority vested in him to compute what was due operators and to procure their signatures to vouchers, and we find no basis in the pleadings or the evidence which would justify a holding that an assault upon an operator who refused to sign a voucher came within the implied authority of Casen or can in any sense be regarded as within the scope of his employment." (p. 24.)

In *Whitman v. Railway Co.*, 85 Kan. 150, 116 Pac. 234, approving reference was made to *Collette v. Rebori*, 107 Mo. App. 711, holding that the master is liable for the tortious acts of his servant when it is shown that the act complained of was done for the purpose of doing the work assigned by the master. In *Lehnen v. Hines & Co.*, 88 Kan. 58, 127 Pac. 612, it was said in the opinion (p. 68) that when the duties of the night clerk of the hotel were to attend to the calls and wants of guests and an assault was made by him while in response to a call, this and the subsequent arrest caused by him were wrongs committed while he was performing those duties and attending to his master's business. In *Kemp v. Railway Co.*, 91 Kan. 477, 138 Pac. 621, after an examination of the authorities it was said:

"To fix liability upon the master or employer the

act must not only be done in the time, but in pursuance of the objects of the employment, in furtherance of duty. If done solely to accomplish the employee's own purpose or device, although in an interval of his regular service, the employer is not liable." (p. 481.)

As to the term "Course of Employment" it is said:

"The act of an agent is within the course of his employment when the agent in performing it is endeavoring to promote his principal's business within the scope of the actual or apparent authority conferred upon him for that purpose." (31 Cyc. 1585.)

The jury were correctly instructed as to the responsibility of the defendant for the acts of its agent, and a general verdict in favor of the plaintiff was returned which involves and implies a finding by the jury that the agent's acts were within the scope of his authority, and within the decisions referred to and from the evidence shown by the record such instructions and conclusion were fairly authorized and supported.

It is urged that the charge of conspiracy was not sustained, and in reply the distinction between civil and criminal conspiracy is brought forward. But the amended petition on which the case went to trial makes no charge or mention of conspiracy, hence this point needs no further attention.

The instructions submitted to the defendant and refused by the court were in reference to the scope of the agency and the duty of an arresting officer. In view of those given we find no error in those refused.

It is complained that certain instructions given touching the duty of an arresting officer and one to whom a warrant is exhibited or made known were erroneous. The jury were charged in conformity with the provisions of sections 129 to 132, inclusive, of the criminal code. We have carefully examined all the instructions given, and they appear to have been fair both to the constable and to the person sought to be arrested as well as to the others concerned. It must be remembered

that the evidence was decidedly conflicting as to whether the warrant was shown or whether Sipult understood that the constable had such a paper, and the charge was framed to meet both contentions and we find no error therein.

The court denied a motion for judgment on the special findings, which were to the effect that Armstrong was a constable, directed by a warrant to arrest Sipult; that he deputized Wilson and O'Brian; that the defendant company did not direct or instruct the issuance of the warrant; that O'Brian knew of the warrant when he "directed his outfit to the place on which Sipult was living"; that Sipult knew Armstrong was a constable; that the latter was afraid to attempt the arrest alone; that Sipult struck the first blow but did not have the general reputation of being a quarrelsome person and a fighter. There is nothing in these answers essentially inconsistent with the general verdict, and hence the motion was properly denied.

It is complained that the evidence failed to show authority and therefcre was erroneously admitted, and that a demurrer thereto was overruled. But the testimony was properly submitted to the jury for their consideration and interpretation.

Finally, it is argued that the plaintiff's injuries resulted from his reliance upon his own prowess and his utter disregard of law. There is much to criticise in the conduct of each of the belligerent forces, and as usual in such cases most, if not all, the violence and consequent injury were entirely needless. The facts shown by the record, however, so fairly support the jury in the result reached that in the absence of any material error such result must stand.

The judgment is affirmed.