No. 20,583.

TESSIE ROEBUCK, as Administratrix, etc., *Appellee*, v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. FEDERAL EMPLOYERS' LIABILITY ACT—*Railroad Employee Assaulted by Fellow Servant—Liability of Carrier—Negligence.* The federal employers' liability act provides a remedy only in cases where the employee is killed or injured from a cause incidental to or arising out of railroad employment, and therefore the ordinary rules governing the relation of master and servant necessarily apply, and the carrier is liable only where it has been negligent in the performance of some duty imposed upon it as employer.

2. SAME—*Negligence—When Rules of Common Law Govern.* In determining what constitutes negligence of the carrier in trials under the federal employers' liability act, the original common-law rules are

to be applied, except where those rules are, by the terms of the act, abrogated, qualified, or restricted; and in case of any conflict between the state and federal courts as to what constitutes negligence the case is controlled by the common law as interpreted and applied in the federal courts.

3. SAME—*Criminal Assault by Fellow Servant—Scope of Employment— Liability of Carrier.* Under the common law of master and servant, as adopted and enforced by the courts generally, the master is not liable for the willful and criminal assault by one employee upon another, where the assault was not expressly or impliedly authorized or within the scope of the employment. (*Crelly v. Telephone Co.,* 84 Kan. 19, 113 Pac. 386.)

4. SAME—*Assault Not Committed Within Scope of Employment—Carrier Not Liable.* In an action brought under the federal employers' liability law (Part 1, 35 U. S. Stat. at Large, ch. 149, § 1, p. 65) to recover damages for the death of plaintiff's husband, a section foreman in defendant's employ, who was stabbed by a Mexican employed under him, the petition alleged that plaintiff's intestate notified his superior officers, the roadmaster and the assistant division superintendent, that he could not get along with the Mexican, and had told him to go home; that the next day his superior officers ordered him to put the Mexican back to work; that he then informed the assistant division superintendent that it would be impossible for him to keep the Mexican at work owing to his quarrelsome disposition; that the latter was a dangerous man and had killed one or two men, and that he did not care about the Mexican taking a shot at him; that afterwards the roadmaster advised him that he had no reason to fear a personal attack or encounter and ordered him to keep the Mexican at work, and stated that the company would see that no harm came to plaintiff's intestate and would protect him; that relying upon the assurances he continued in the defendant's employ as foreman, while the Mexican remained a member of the section gang; and that while both men were in the employ of the defendant within the scope of their employment the Mexican stabbed and killed plaintiff's intestate without warning and without provocation. *Held,* that on the facts alleged in the petition no cause of action was stated under the federal employers' liability law, for the reason that on the undisputed facts the assault was not committed in the course or scope of the Mexican's employment, nor in the furtherance of the defendant's business.

Appeal from Montgomery district court; THOMAS J. FLANNELLY, *judge.* Opinion filed January 6, 1917. Reversed.

*William R. Smith, Owen J. Wood, Alfred A. Scott,* and *Harlow Hurley,* all of Topeka, for the appellant.

*Thomas E. Wagstaff,* of Independence, for the appellee.

35—99 KAN.

The opinion of the court was delivered by

PORTER, J.: This is an appeal from an order of the district court overruling defendant's demurrer to plaintiff's petition. The action was to recover damages in the sum of $22,460 for the death of plaintiff's husband, Charles Roebuck, a section foreman in its employ, who was killed by Jose Negreta, a Mexican, employed in Roebuck's section gang.

The petition alleges that Charles Roebuck died as a result of being stabbed on the 24th day of June, 1915, by one Jose Negreta; that both men were at that time in the employ of the defendant within the scope of their employment; that the assault which caused the death of the decedent was without warning, and without provocation or fault on his part. It alleges that the decedent was straw boss, or extra gang foreman, and took his orders from J. Carlson, roadmaster, and J. F. McNally, assistant division superintendent of the defendant company; that on the 7th day of March, 1915, he notified Carlson, in writing, that he could not get along with Negreta, that the latter had cursed him, and that he had told Negreta to go home, that he could not use him any longer. It alleges that the next day Carlson telegraphed him to put Negreta back to work, by order of McNally, assistant division superintendent; that on the 9th day of March the decedent notified McNally that it would be impossible for him to work Negreta, owing to his quarrelsome disposition, that Negreta was a dangerous man and bore such a reputation; that he had killed one or two men, and he (the decedent) did not care about his taking a shot at him; that thereafter the roadmaster advised him verbally that he had no reason to fear a personal attack or encounter from Negreta, and ordered him to keep Negreta at work, and stated that the company would see that no harm came to decedent, and would protect him; that relying upon the assurances, the decedent, under the orders of Carlson and McNally, continued in defendant's employ as foreman of the extra gang while Negreta remained a member thereof.

The negligence charged is that the defendant did not furnish Roebuck a safe place in which to work, in that it did not furnish him safe instrumentalities, means and help with which he

was to perform his work, and in retaining Negreta in its employ in the gang which Roebuck was employed to boss, after defendant had been notified of the violent, dangerous, vicious and malicious habits and reputation of Negreta, all of which the petition' alleges the defendant knew or might have known, but failed to make any investigation thereof after being notified. The petition alleges that the' decedent had no authority to finally discharge any member of the extra gang without the consent of Carlson or McNally, and that Negreta well knew this fact and knew that the decedent was compelled, by the direction of Carlson and McNally, to keep Negreta at work under him.

The defendant is a common carrier doing both an intrastate and interstate business, and the petition alleges that the track on which the decedent and Jose Negreta were laboring at the time of the assault was then being used by the defendant for such business.

The action is brought under the federal employers' liability law, which provides that every common carrier by railroad, while engaged in interstate commerce, shall be liable in damages for the injury or death of any person while he is employed by such carrier in such commerce, "resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves or other equipment." (Part 1, 35 U. S. Stat. at Large, ch. 149, § 1, p. 65.)

Although the petition alleges that at the time the act was committed both Roebuck and Negreta were engaged in work within the scope of their employment, it is not contended that Negreta's act in stabbing Roebuck was done in the scope of his duty as an employee of the defendant. This, it is conceded, was an independent act of Negreta's outside the scope of his duties to the railway company. The plaintiff's contention that the case falls squarely within the provisions of the federal employers' liability law is based on the claim that defendant failed to furnish Roebuck a safe place to work, "in that it did not furnish him with safe instrumentalities, means and help" with which to perform his work. In this connec-

tion it is said, too, that Carlson and McNally had authority to discharge both Roebuck and Negreta, and that the former had a right to rely upon the assurances given him by his superior officers that they would protect him and that no harm would come to him by reason of Negreta being kept at work under him.

As we construe the petition, the negligence upon which the plaintiff seeks to rely is not Negreta's act in stabbing Roebuck, but the the negligence of the defendant in continuing Negreta in its employ in Roebuck's gang after being notified of the violent, vicious and dangerous disposition of Negreta. The plaintiff's brief assumes, and it is doubtless true, that defendant's liability would be no greater because Roebuck notified defendant of Negreta's vicious and dangerous disposition, provided defendant had actual or constructive notice thereof.

The defendant's main contention, briefly stated, is that the federal employers' liability act provides a remedy only in cases where the employee is killed or injured from a cause incidental to or arising out of railway employment, and that therefore the ordinary rules governing the relation of master and servant necessarily apply, and the master is liable only where he has been negligent in the performance of some duty imposed upon him as master.

Counsel for plaintiff objects to what is termed the "sweeping theory" advanced by the defendant that the ordinary rules governing master and servant must apply in this case, and insists that under the common-law rule of master and servant the master is liable only where he has been negligent, while in an action brought under the federal employers' liability law the carrier is liable for death or injury which results not only from the negligence of the master, but also by that of its officers, agents or employees.

But the common law of master and servant as administered in this country and England for more than half a century has held the master liable not only for his own acts of negligence, but for those committed by his agents or servants in the course of their employment, upon the well-settled maxim *qui facit per alium, facit per se*. When the principle, *respondeat superior*, was first adopted, it applied only to the negligent acts of the master, and this continued to be the law for many years,

the decisions following the leading English case of *M'Manus v. Crickett* (1800) 1 East, 106, 5 Revised Rep. 518. In the past fifty years the authority of that case has gradually been repudiated by courts everywhere. (*Mott v. Consumers' Ice Company*, [1878] 73 N. Y. 543.)

In *Barlow v. Emmert*, (1872) 10 Kan. 358, it was intimated in the opinion, or at least taken for granted, that the master would not be liable for a willful trespass committed by his servants, and that case has been cited as the law of Kansas. However, in *Hudson v. M. K. & T. Rly. Co.*, (1876) 16 Kan. 470, the maxims, *respondeat superior*, and *qui facit per alium, facit per se* were recognized as applying to the tortious or wrongful acts of the servant, provided they were done in the course of or within the scope of such servant's employment. Moreover, even in those jurisdictions where the fellow-servant doctrine has been maintained in all its strictness, the courts have uniformly recognized an exception to that doctrine and have held the master liable for injuries to servants arising from such negligence of fellow servants as are due to their incompetency, if the master himself has been negligent in the selection of incompetent servants or has kept incompetent servants after notice of their unfitness, or where by using ordinary care and diligence he might have known of such unfitness. (*Hilts v. Chic. & G. T. Ry.*, 55 Mich. 437; *Gilman v. Eastern Railroad Corporation*, [1865] 92 Mass. 233. In the last cited case it was said:

"But it is quite as well settled, both in England and America, that a master is bound to use ordinary care in providing his structures and engines, and in selecting his servants, and is liable to any of their fellow-servants for his negligence in this regard (Citing cases)." (p. 238.)

The federal act takes away from the carrier defenses formerly available to it by eliminating the doctrine of fellow servant and by the modification of the doctrines of contributory negligence and assumption of risk. Aside from these exceptions, it is conceded by counsel for plaintiff that the ordinary rules of master and servant control and govern the present case.

The present case is not free from difficulty. It is one of first impression in this court; and with the exception of one case, to be presently noticed, and which did not arise under the fed-

eral act, we have been cited to no similar case where it has been held that such an action would lie. The federal employers' liability law gives a right to recover for injury or death of an employee of an interstate carrier "resulting in whole or in part from the carrier's negligence," and the present action is predicated solely upon the negligence of the defendant carrier in retaining in its employ a vicious, turbulent and dangerous fellow servant of plaintiff's intestate, with actual notice of the dangerous character of such fellow servant.

The difficulties which present themselves are these: It is conceded, indeed it could not be seriously contended otherwise, that Negreta, when he stabbed plaintiff's intestate, was not engaged in carrying on the work which he had been employed to do, nor in the furtherance of that work. His criminal act was outside and beyond the scope of his employment. The duty which the law imposes on the master to exercise ordinary care in the selection of competent and suitable fellow servants has uniformly been applied, so far as we have been able to discover, only where the alleged incompetency had reference to the duties which the servant was employed to perform. As a rule the cases where the master has been held liable for the failure to perform this duty have been those where he has negligently retained in his employ a servant addicted to drunkenness, which rendered the servant unfit and thereby caused some accident resulting in injury to another servant; or where the master retained in his employ inexperienced or unskillful servants whose blunders and mistakes have caused injury to another servant; or where the injury was occasioned by the master's failure to have a sufficient number of servants to perform the work. The master's negligence, in other words, has always been predicated on his failure to perform some duty which the law imposes upon him as master and which he owes to the servant.

In the cases heretofore decided by this court, where it has been sought to hold the master liable for the tortious act of the servant, the principal inquiry has always been whether the servant was acting in the course or scope of his employment. (*Sipult v. Land and Grain Co.,* 94 Kan. 224, 146 Pac. 329, and cases cited in the opinion.)

"The difficult question in all cases is whether the particular act was really within the scope of the servant's employment." (26 Cyc. 1526.)

In the Crelly case, the local manager of a telephone company demanded of an operator of the company, who was about to quit the service, that she sign a voucher for compensation due her, and when she refused to sign the same he violently assaulted and beat her. It was held that the plaintiff could not recover against the company because the act complained of was not done by the servant as a means or for the purpose of performing the duties assigned him by the master. It was said in the opinion:

"No circumstances indicate that the company contemplated the use of force to obtain signatures to vouchers, nor was there anything to show any connection between the assault and any duty which devolved on Casen [the manager]." (p. 22.)

It was also said in the opinion, quoting from 26 Cyc. 1526:

" 'The test is not the character of the act, nor whether it was done during the existence of the servant's employment; but whether the injury complained of was committed by the authority of the master expressly conferred or fairly implied in the nature of the employment and the duties incident to it.' " (*Crelly v. Telephone Co.*, 84 Kan. 19, 23, 113 Pac. 386.)

In *Kemp v. Railway Co.*, 91 Kan. 477, 138 Pac. 621, a brakeman on a freight train of defendant, after ejecting trespassers from the train, left the train, ran after them and fired a shot which caused the death of one of them. It was held, the facts being undisputed, to be a question of law for the court to determine whether the brakeman was acting within the scope of his employment; and this question the court answered in the negative. It was said in the opinion with reference to the exact meaning of the phrase "scope of the employment" that "the act must not only be done in the time, but in pursuance of the objects of the employment, in furtherance of duty. If done solely to accomplish the employee's own purpose or device, although in an interval of his regular service, the employer is not liable." (p. 481.) The opinion distinguishes "between acts done by the servant in pursuing his own ends, although done in the time covered by his employment, and those done in pursuance of his duty in the course of his employment" (p. 481), quoting from the opinion in *Morier v.*

*St. Paul, Minneapolis & Manitoba Ry. Co.*, 31 Minn. 351, as follows:

> " 'If the servant step aside from his master's business, *for however short a time,* to do an act not connected with such business, the relation of master and servant is for the time suspended. Such, variously expressed, is the uniform doctrine laid down by all authorities. (p. 353.)'. (1 Thompson's Commentaries on the Law of Negligence, § 526.)" (p. 481.)

One of the cases cited and relied upon by the plaintiff is *Lamb v. Littman,* 128 N. Car. 361. There an employer was held liable for an assault committed upon a child in his employ by his overseer who was in command of the department in which the plaintiff was a floor sweeper. The opinion contains but a meager statement of the facts. It was said in the opinion, however, "but it appears that the injury received was caused by the violent handling of plaintiff by defendant's *alter ego* in urging him to the proper performance of his work." (p. 365.) It was distinctly held, therefore, that the overseer was representing the master at the time the assault was committed, and where this is true there can be no manner of doubt but that the master is liable. The case is not one which throws any light on the question we have under consideration.

The principal case relied upon by the plaintiff is *Missouri, K. & T. Rly. Co. of Texas v. Day,* 104 Tex. 237. Paragraph 2 of the syllabus in that case reads:

> "The master may be held liable for negligence in the selection of an unfit servant—intemperate in habits and violent in disposition where injury in consequence thereof results from his assault on another employee in an altercation over the performance of the master's work, as well as in the case of injury by negligence of such unfit servant."

The servant who committed the assault was "straw boss," and in the absence of the foreman of the bridge gang in which the plaintiff was employed, acted as assistant foreman. The foreman, when present, controlled the gang, but the straw boss was expected to lead in the work and tell the men what to do when he received his orders from the foreman. The plaintiff testified that he was at work with the bridge gang, and that the foreman was present directing the work; the straw boss kept calling on the men to load the material and swore at them. The foreman himself had given another order, but the straw boss kept calling on them to load. "We were confused by the

orders. Mr. Irby had told us to do one thing, and Mr. Milan was telling us to let them go" (p. 239) ; that plaintiff made the remark "we will have to get somebody to tell us what to do" (p. 240) ; that the straw boss then ran toward him with a knife and assaulted plaintiff, cutting and slashing him. No cases or authorities are cited, except those which adhere to the common-law rule holding the master liable for negligence in retaining in his employ incompetent and unfit servants with notice of their unfitness. An examination of the cases cited discloses that in almost every instance the unfitness was caused by habitual drunkenness which rendered the servant incompetent to perform with safety to his fellow servants the duties he was employed to perform. Most of the comment in the opinion relates to what facts are sufficient to establish the master's notice or knowledge of the servant's unfitness. The, opinion then proceeds:

"And we think there could be no difference whether the injury result from negligence in doing the master's work, or from an assault made by a dangerous, drunken, and desperate employee, if his reputation was such that the master might reasonably have foreseen such consequences." (p. 246.)

The opinion would be more persuasive if it were supported by the citation of some decided cases or authorities, or if it were stated in the opinion upon what ground the court ignored, without comment, the general rule that in order to hold the master liable for the willful assault of a servant the act must appear to have been committed in the course or scope of the servant's employment. "Scope or course of employment" is not mentioned or referred to in the opinion; although stress is laid upon the fact that the assault was committed in the presence of the foreman who was in charge of the work, and the section of the syllabus we have quoted, *supra,* contains expressions suggesting that the court intended to limit its declaration of law to a case where the assault occurs in "an altercation over the performance of the master's work." (Syl. ¶ 2.) A careful reading of the opinion, however, shows no attempt to limit the application of the rule adopted as decisive of the case.

If this were a common-law action, wholly independent of the federal employers' liability act, the case decided by the Texas court would be very much in point as to the facts. We

should then have squarely before us the question whether the express notice given to defendant by plaintiff's intestate touching the reputation of Negreta as a turbulent, vicious and dangerous person; the fear Roebuck expressed to defendant that Negreta, if retained as a workman under him, would seek a quarrel and do the very thing it subsequently turned out Negreta did; the refusal of the defendant, when notified of Negreta's dangerous proclivities, to discharge him or find employment for him elsewhere; whether or not all these facts and circumstances are sufficient to entitle plaintiff to recover.

Plaintiff's intestate, however, was an employee, and the action is brought against the employer to recover for death alleged to have been caused by the employer's negligence; and since it is brought under the federal employers' liability act, it can be maintained only upon the ground that the negligence consisted of the employer's failure to perform some duty or obligation owing to the employee under the law which applies to master and servant; not necessarily as this court would determine that question in a common-law action here, but as the federal courts would determine it. While the federal employers' liability act does not define the term "negligence" of the carrier, it has been determined that the expression as used in the act is the common-law negligence of master and servant as defined by the federal courts, and that the common law as interpreted and applied in the federal courts determines what constitutes negligence; and if a state court differs with the federal courts as to what will or will not constitue negligence, the interpretation of the federal courts necessarily controls. In Richey's Federal Employers' Liability, 2d ed., § 52, it is said:

"The act does not undertake to define negligence or in any way limit the application of the common-law rule upon that subject, therefore what constitutes negligence in the employees or instrumentalities is determined by the common law, as interpreted and applied in the federal courts. . . . Speaking accurately there is no common law of negligence of the federal courts as distinguished from the common law of negligence of the state courts. The law of negligence is the same in both, and apparent differences of opinion arise because of the application of the law to different combinations of facts, and frequently on account of confusing negligence which may or may not be the cause of an injury and actionable negligence which unites cause and effect. . . . Should there be any difference under the state doctrine, as to what constitutes negligence at common law, and the rule in the federal courts, there is no doubt that

the federal rule must control, the same as it does in contributory negligence and assumption of risk. And certain it is that in trials under the act to determine negligence, the original common-law rule is to be applied, and not the rule as restricted or enlarged by any local statutory provision."

In a recent case, *Seaboard Air Line v. Horton*, 233 U. S. 492, it was held that the common-law rule with respect to the employee's assumption of risk of injury governs to the exclusion of any state statute abolishing the assumption of risk as a bar to an action, and it was also held that the elimination of the defense of assumption of risk by the act itself is evidence of the intention of congress that in all other cases such assumption of risk shall have its former effect as a complete bar to an action. In the opinion Mr. Justice Pitney, referring to the clause of the act quoted, *supra,* which makes the carrier liable for injury or death of an employee, mentions the fact that the clause has two branches; "one covering the negligence of any of the officers, agents, or employees of the carrier, which has the effect of abolishing in this class of cases the common-law rule" as to fellow servants; "and the other relating to defects and insufficiencies in the cars, engines, appliances, etc." (p. 501.) The opinion then proceeds:

"But, plainly, with respect to the latter as well as the former ground of liability, it was the intention of Congress to base the action upon negligence only, and to exclude responsibility of the carrier to its employees for defects and insufficiencies not attributable to negligence. The common-law rule is that an employer is not a guarantor of the safety of the place of work or of the machinery and appliances of the work; the extent of its duty to its employees is to see that ordinary care and prudence are exercised, to the end that the place in which the work is to be performed and the tools and appliances of the work may be safe for the workmen. (Citing cases.)" (p. 501.)

Futher in the opinion it was said:

"The plain effect of these words is to condition the liability upon negligence; and had there been doubt before as to the common-law rule, certainly the act now limits the responsibility of the company as indicated." (p. 502.)

It was further said in the opinion, with reference to the modification in the statute of the defense of assumption of risk, that "eliminating the defense of assumption of risk in the cases indicated, quite plainly evidences the legislative intent that in all other cases such assumption shall have *its*

*former effect* as a complete bar to the action." (Italics ours. p. 503.)

It is a common thing in these days for statutes to be enacted abrogating some of the common-law defenses of the master to actions by an employee for injuries sustained in his employment; and very frequently statutes, such as mining acts and factory acts, compensation acts and employer's liability acts impose upon the employer duties and liabilities which were unknown to the common law. Except where some such statutory provision governs, we are aware of no rule of law adopted by the courts which goes to the extent of holding the master liable for the willful and criminal assault by one employee upon another, where the assault was not expressly or impliedly authorized or within the scope of the employment. As was said in *Crelly v. Telephone Co.,* 84 Kan. 19, 113 Pac. 386:

"The act, as in this instance, may have been done while the servant was in the master's service; but, unless it was expressly or impliedly authorized, or within the scope of the employment, the servant alone is responsible." (p. 21.)

In the same volume of the Texas reports in which the decision we have quoted from, *supra,* is published, there appears the case of *Medlin Milling Co. v. Boutwell,* 104 Tex. 87. In that case the syllabus reads:

"1. The master is not liable to a servant for an assault upon him by other servants in no way connected with their duties to the employer—as where employees of a milling company, in pursuance of a custom before practiced, undertook to 'initiate' a new employee into the service by stretching him across a barrel and 'paddling' him, and he was injured in resisting such violence.

"2. The knowledge and acquiescence of officers or managers of a company in a custom of rude frolic by employees in receiving a new one into the service, amounting to assault and inflicting injury, was not within the scope of their authority or in the company's service, and it was not rendered liable to the injured party by such acquiescence."

In the opinion it was said:

"It is not the legal duty of the master to protect the servant from unlawful assaults by strangers, and another servant committing such an assault, not in the scope of his employment, must be regarded as a stranger." (p. 90.)

It is plain that it could not have been the intention of con-

gress to make the carrier liable for injury or death to an employee occasioned by the act of a stranger. We are fully in harmony with the liberal interpretation of the federal employers' liability act by the federal courts generally; but we can not conceive it to have been the intention of congress to impose upon the carrier duties and obligations save those of an employer; nor that it was the purpose to impose new obligations not usually imposed upon employers, except as the law of master and servant is by the express terms of the act itself limited or restricted.

The defendant interposes the doctrine of assumption of risk as a further defense to the action. The federal employers' liability act leaves that as much a defense to the carrier as it was before the act was adopted, except "in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee." (Part 1, 35 U. S. Stat. at Large, ch. 149, § 3, p. 66.) Assumption of risk, therefore, is a proper defense to be urged in the present case. The plaintiff seeks to avoid it by the doctrine of a complaint and promise. The plaintiff's intestate complained to his immediate superiors of the dangerous proclivities of Negreta and they told him, in substance, that he was in no danger of assault or injury; and to keep Negreta at work, and said the company would protect him. The defendant insists that this falls far short of a promise to repair a dangerous situation, and further that neither Carlson nor McNally had any authority to make a promise to protect Roebuck which could bind the defendant. There is some room for argument that nothing said by Roebuck's superiors was relied upon by him as a promise to change conditions. It appears that there was no promise to move Negreta from daily association with him, and there is some ground also for argument that all that was said to him by McNally and Carlson merely persuaded him that the danger was not so great as he had believed, and that it induced him to assume the risk. Having reached the conclusion that the action can not be maintained for the other reasons stated, we deem it unnecessary to decide the question of assumption of risk.

It follows that the judgment will be reversed and the cause remanded with directions to sustain the demurrer.

JOHNSTON, C. J., and WEST, J., dissenting.