No. 28,801.

HARRY F. KASTRUP, *Appellee*, v. THE YELLOW CAB AND BAGGAGE COMPANY, *Appellant*.

(282 Pac. 742.)

Opinion filed December 7, 1929.

*Guy L. Hursh,* of Topeka, for the appellant.

*Thomas F. Doran* and *C. B. Randall,* both of Topeka, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by Harry F. Kastrup, a discharged cab driver, against the Yellow Cab and Baggage Company, to recover damages for battery inflicted on Kastrup by the company's superintendent of cab drivers. Plaintiff recovered, and defendant appeals.

The business of the company is sufficiently indicated by its name. Roy Payne was manager of the company. Charles E. Holman was secretary and treasurer. Earl Harris was superintendent of cab drivers. Max Dooley was manager of the transfer department. Lawrence Heil was a dispatcher. Al Bigley was shop foreman. Harris received his instructions from Payne, and had authority to hire and discharge cab drivers. When a cab driver was employed he was required to give a cash bond in the sum of fifty dollars to protect the company against loss. Usually applicants could not give the bond, and in order to keep a full crew of cab drivers the rule was relaxed. An applicant was allowed to make a deposit of fifteen dollars, to be turned over to the treasurer, and the remainder of the security would be taken out of his wages.

In the latter part of December, 1923, Harris hired Kastrup as a cab driver. Kastrup could not make the required fifteen-dollar cash deposit, and Harris took Kastrup's post-dated check to the company for the amount. Harris did not deliver the check to Holman. One of the regulations was that a cab driver should not be permitted to operate a cab until he had given bond. When Kastrup's run-sheets commenced to come in Holman noted that he had no bond for that driver, and Holman inquired of Harris concerning Kastrup's bond. Harris then told Holman about taking the post-dated check.

Kastrup worked until January 9, 1924. During the period of his employment he had two inconsequential accidents. About 2:30 o'clock in the morning of January 9 he collided with a telephone pole and broke the fender and bent the front axle of his cab. He drove the cab in, took out another, and worked until about 10:30 in the forenoon of the same day. When he went off duty he went

to his room in the Y. M. C. A. building to sleep. Before leaving he had some conversation with Harris about the accident. Harris said Kastrup should call him when Kastrup waked up. On the afternoon of the 9th Kastrup called Harris by telephone to find out when he should return to work, and Harris said his services were no longer needed. Harris visited Kastrup in his room at about 10 a. m. of the 10th. In the meantime Kastrup stopped payment of the check, and Harris had been to the bank and learned that payment had been stopped. A conversation occurred in which Kastrup was asked to pay the check, and he refused to do so. Harris suggested they go to the office and talk to Holman, and they did so. Kastrup said he would not pay the check, but he was willing to pay the amount of the damage to the cab, and he wanted an itemized statement. It was not feasible to make an itemized statement at that time, and Holman or Harris suggested that Harris see the county attorney with respect to the post-dated check. The witnesses agree that Harris said he was going to the county attorney's office, went to his car, which was in the garage adjoining the office, and made a final inquiry of Kastrup whether he would pay the check. Witnesses disagree with respect to what then occurred. Kastrup testified as follows:

"He got into his car, and said, 'This is your last chance.' I made the suggestion that I would go along with him. I felt I was in the right, and he said he didn't want me to go along, and then I told him I would be at the Y. I was something like six feet from him when we had this conversation. I did not at any time get up on the running board of the car or stand on the running board, nor try to get into the car, nor have any scuffle or contest with Harris while he was in the car. When I told Harris that I would be at the Y, I turned to leave, and then I know there was a sudden jar. I came in contact with something. Following that I knew that something was wrong, that I was hit or something. I didn't know anything else that happened."

A cab driver, Oscar Brown, who said he left the company by virtual discharge some time after the altercation, corroborated Kastrup with respect to the striking of the first blow, and said Kastrup did not strike back. Brown described the battery as one of the utmost vindictiveness and brutality, and testified that in the course of it Harris said three times, "Are you going to make it good, going to make the check good?" Dudley Wilson, another former cab driver, corroborated Brown's account of the beating.

Harris testified as follows:

"After I said I was going to the county attorney's office, I again asked

Kastrup if he was going to pay the check, and he said no. I then went out and got into my car. Kastrup followed me, and came out to the car and started to get in. I told him I was going to the county attorney's office, and he said he was going along, and I said he couldn't. He was then standing by the car. We started swearing at one another. He got upon the running board of the car, took hold of me, and started hitting me in the head, and we started fighting, and I was down behind the wheel. I turned him out, and he was hanging on me, and we came out of the car and kept on fighting on the floor. He struck at me and hit me. We fell to the pavement and rolled around, and he got hold of my privates and I tried to knock him loose. He turned loose finally, and Al Bigley, the mechanic, helped me up."

Holman, Heil and Bigley corroborated Harris with respect to the beginning of the fight and other details. Dooley was at the dispatcher's desk. He said he heard a noise, looked through the glass partition between the office and the garage, and saw Harris and Kastrup fighting. They were on the floor, hitting each other.

Kastrup received personal injuries, and the jury returned a verdict in his favor for $4,500. With the verdict the jury returned the following special findings of fact:

"Q. 2. In using whatever force he may have used, did Earl Harris do so in an effort to collect the amount of the $15 check which plaintiff had executed? A. Yes.

"Q. 4. Was Earl Harris expressly authorized by the defendant to use force in collecting the amount of the check from plaintiff? A. Not directly, but implied.

"Q. 5. If you answer No. 4 in the affirmative, then state by whom and in what manner Earl Harris was expressly authorized to use force in collecting the check from plaintiff. A. By the authority given him as agent for the company.

"Q. 6. Was Earl Harris authorized by defendant company in any manner to use force in collecting the amount of the check from plaintiff? A. So implied.

"Q. 7. If you answer No. 6 in the affirmative, then state in what manner Earl Harris was authorized by defendant to use force in collecting the amount of check from plaintiff. A. They condoned his act by retaining him in their employment and subsequently promoting him.

"Q. 9. In using whatever force he may have used, did Earl Harris do so for the purpose of collecting the amount of the check given by plaintiff for the defendant? A. Yes."

The company demurred to plaintiff's evidence, moved for an instructed verdict, moved to set aside all the foregoing special findings, and moved for a new trial on all the statutory grounds. The demurrer was overruled, the motions were denied, and judgment was rendered for Kastrup.

The case was here once before: *Kastrup v. Yellow Cab and*

*Baggage Co.,* 124 Kan. 375, 260 Pac. 635. At the first trial the jury returned a verdict for Kastrup. The district court set the verdict aside and granted a new trial because the jury had not been properly instructed. Kastrup appealed, and the company noted a cross appeal. This court declined to interfere, and summarized its conclusions in the first and third paragraphs of the syllabus:

"In an action to recover damages from a principal and master because his agent and servant in endeavoring to collect a claim from another assaulted and beat him, the court in a specific instruction left out the essential element that the liability of the principal and master depended upon whether the agent, when he committed the assault, was acting within the scope of his authority expressly conferred on him by his principal or fairly implied in the nature of his employment, and because of the omission the court subsequently set aside a verdict for plaintiff and granted a new trial: *Held,* that the court was warranted in granting a new trial.

"The refusal of the court to enter judgment for defendant on the evidence and findings is sustained."

At the second trial the court instructed the jury with respect to the meaning of the words "scope of employment" as follows:

"The test of whether an act is within the scope of the agent's or servant's employment is not whether it was done during the existence of the employment, but whether the act complained of was committed by the authority of the principal or master expressly conferred or fairly implied from the nature of the employment and the duties incident to it."

The instruction is quoted here merely as an aid to interpretation of the special findings. The instructions as a whole are not now important, because the jury has made findings of fact to which this court can apply the law. The case having been twice presented, the court has matured views concerning it.

Question 4 propounded to the jury was whether Harris was expressly authorized to use force to collect amount of the check. The answer should have been "no," because there was no evidence that anyone having power to prescribe Harris' duties gave him express instructions to assault and beat cab drivers, or anybody else, under any circumstances. The answer returned is, however, free from ambiguity. The expression "not directly" is the equivalent of "not expressly," and the remainder of the answer says, in effect, that Harris had implied authority to use force to collect the amount of the check.

Question 5 called for an answer in case the jury found, in response to question 4, that Harris had express authority. Question 5 was too plain to be misunderstood. If Harris had express authority,

who conferred it, and how? The jury having just negatived express authority, question 5 needed no answer. Being unable to specify anyone who had in any manner expressly authorized Harris to use force, the jury volunteered the statement, "By the authority given him as agent for the company." What did that mean—express authority to assault and beat, or authority to assault and beat somehow implied? The jury's meaning was made perfectly clear by the answer to question 6. The answer to that question was "So implied," which was the same as the answer to question 4.

The result is, findings 4, 5 and 6 mean just this: Harris had no express authority to use force to collect the amount of the check, but he had implied authority to do so.

Question 6 inquired broadly if Harris was authorized *in any manner* to use force in collecting the amount of the check. Question 7 required the jury to specify manner of authorization, in case an affirmative answer were given to question 6. In the answer to question 7, the jury gave the specification: "The company condoned his act." Condoned his act how? "By retaining him in their employment and subsequently promoting him." There was no evidence whatever that Harris was subsequently "promoted" to exalt him, or for any purpose other than to meet business needs of the company, or that change in assignment of duty was made within any period of time warranting an inference that promotion bore relation to the battery. Therefore the findings of the jury reduce to this: Harris had authority to use force to collect the amount of the check, implied from the fact that the company retained him in its service.

The jury invented the condonation theory of implied authority. The theory was not referred to in the instructions. The instruction quoted permitted the jury to derive implied authority from nature of employment and duties incident to it. The jury could not candidly say the nature of Harris' employment and the duties incident to it embraced use of force to collect the amount of the check, and the jury resorted to what they called condonation—what lawyers call ratification—as a source of authority.

While ratification of an unauthorized act puts parties in interest in a relation equivalent to that which would have resulted if previous authority had existed, ratification requires, as its antecedent, lack of any authority, either express or implied. Ratification deals with consequences of unauthorized acts. If authority for an act

existed, either expressly conferred or properly implied, there is no room for ratification:

"Proceeding now to consider the question more fully, it may, in the first place, be observed that, although frequently said to be such, ratification is not a form of authorization. It is rather a cure for the lack of authorization, or a substitute for authorization. It presupposes that there was no authority; and there can, in the nature of the case, be no authority to do an act given after the act is done. The utmost that is then possible is to do something to cure that defect, or to provide some method of now dealing with the situation as though authority had been given." (1 Mechem on Agency, 2d ed., p. 261, § 348.)

If by use of force Harris had taken fifteen dollars in money from Kastrup's pocket, had turned the money over to Holman, and the company, with full knowledge of all the facts, had kept the money, it might be said the company ratified the tortious act. Nothing of the kind happened. Harris used force to compel Kastrup to pay money which regularly Harris should have required Kastrup to pay before he commenced work. The company did not discharge Harris. How did that make the company liable? The answer is it did not make the company liable.

There was no certainty of fact that Harris did beat Kastrup in an effort to collect money for the company. Harris, Holman, Heil, Dooley and Bigley all held positions of importance and responsibility. They saw what occurred and they have contradicted and continued to contradict, under oath, the stories of the cab drivers. It is true that in June, 1928, the issue was settled by a jury in a manner binding on the company; but that does not mean the company knew or should have known that its heads of departments were making false reports, and that at some future time they would be tacitly branded as perjurers by a jury.

Harris had been with the company since 1911, except for about one year. He worked in various capacities until he became assistant manager. Afterward, about 1922, he was made superintendent of cab drivers, which position he held when the altercation occurred. He was still superintendent of cab drivers at the time of the first trial. At that time Holman was general manager of the company. Afterwards Holman accepted other employment, and Harris again became assistant manager. Conceding that the company knew Harris lost his head, and tried to get for the company the money which he let slip by trusting Kastrup, by beating Kastrup until he paid or promised to pay, the company was not put to choice of

either depriving itself of the benefit of Harris' experience and capability, or of resting under the imputation that it adopted his wrongful act as its own. Besides that, discharge might just as well be interpreted as indicating the company did recognize that the altercation was not Harris' personal affair and that the company was involved in it; otherwise, why discharge? There are authorities which say that if Harris did have authority from the company to beat Kastrup, failure to discharge Harris could be considered in assessing damages. However that may be, to infer ratification by the company of Harris' unauthorized act from failure to discharge him is to base liability, not on facts of the company's actual situation and attitude, but on conjecture concerning Mrs. Grundy's attitude.

There is the same confusion of tongues respecting ratification that renders lawless other portions of the law of agency. (Annotation, L. R. A. 1918-B, p. 155.) Decisions have been rendered since the annotation was published, some one way, some another. A good discussion of the principle involved appears in the opinion in *G. C. & S. F. Ry. Co. v. Kirkbride,* 79 Tex. 457:

"The court also charged the jury that if the servant of defendant acted without the scope of his authority when ordering plaintiff to descend from the car they should find for the defendant, 'unless you should further find from the evidence that the defendant after full notice of the conduct of its employee ratified the same by retaining him in its employment, in which last case you will find for plaintiff.' ·

"This charge, we think, was erroneous. We are not prepared to hold that the performance of a wrongful act by a servant, for which his employer for any reason is not liable at the time the act is committed, shall become the act of the employer afterwards simply because he refuses to discharge the servant from his employment. [Citation.]

"We think it would be extending the doctrine of ratification too far to apply it to such a case as the one before us. Notwithstanding his one fault the servant may be a useful and deserving one and worthy of promotion and encouragement. We do not think it either just to the individual, necessary for the general good, or a wise public policy to so arbitrarily punish the master for lenity to a servant otherwise deserving and perhaps penitent.

"The rule invoked might lead to the discharge of an innocent and useful servant when wrongfully accused or suspected, because his employer could not be certain in advance what would be the result of a future trial, and instead of taking the risk of being charged with a pecuniary liability for which he was not otherwise responsible, might discharge the servant." (p. 459.)

The court holds that under the circumstances ratification of Harris' act was not inferable from the fact that the company did not discharge him.

Kastrup contends the findings should be read together, and that when read together they show the jury meant to find Harris was acting within the scope of his authority. The court has read the findings together. They were framed to prevent the jury from taking refuge in such generalities as "scope of authority," and the statement contained in the answer to question 5, "authority given him as agent for the company." The questions were: Was Harris expressly authorized, and if so, by whom, and how? Was Harris authorized in any manner, and if so, how? When obliged finally to tell how Harris got authority before the act to do the act, the jury specified inaction of the company after the act.

The seventh finding is just as clear and just as important as any other finding. The district court refused to strike it out, and this court is obliged to give it effect.

The foregoing decides the case in favor of the company on the findings of fact, and this opinion should end here. Since, however, Kastrup insists and insists that Harris was "acting within the scope of his authority" when the beating was administered, the court will dispose of that contention.

Some preliminary observations may help to clarify the subject, upon which, as the master of the law of agency, Floyd R. Mechem, demonstrated, much loose thinking and loose writing have been expended. (2 Mechem on Agency, 2d ed., §§ 1977-1979, and footnotes to those sections.)

The fact that, while Harris was beating Kastrup, Harris kept saying, "Are you going to make the check good?" and the fact that the jury found Harris used force to collect the amount of the check for the company and not for himself, have no bearing on the question, What authority did Harris have from the company to administer the beating? And statements such as, Harris was acting on behalf of the company in beating Kastrup, Harris was doing what he was employed to do—collect money for the company—beg the question, What authority did Harris have from the company?

How could the jury know, and how can this court know, whether Harris was authorized, or was not authorized, to use force in an effort to collect money from Kastrup for the company?

A principal says to his agent, Take my bay horse and sell him for cash. The agent has express authority to take the principal's bay horse and sell him for cash. What else may the agent rightfully do? The agent may use his best judgment with respect to what is

the best price obtainable; he may deliver the horse when sold; he may receive the cash. He may do these things because the express authority carried with it an implication that he might do them.

Why did the express authority carry with it implied authority to do so much more than the principal expressly mentioned?

Juries are seldom instructed on this vital subject, and the instruction given in the instant case stated no criteria by which the jury could determine what may be fairly implied, and what may not be fairly implied, from the authority conferred on Harris to obtain money from cab drivers to protect the company from loss resulting from careless driving.

In order to be bound, the principal must have indicated in some way consent that the agent should act for him. Consent to do a given act may be implied from consent to do another act, or other acts; but every implication of authority must be traced to the principal. Express authority to do an act carries with it authority to do those subordinates and incidental acts which may be reasonably necessary and proper to be done, or which are usually and ordinarily done, in order effectively to do the main thing. Authority, whether express or implied, is to be exercised in the usual and ordinary way; and authority to do an act is not implied from authority to do another act, unless the acts are so related to each other or the circumstances are such as to justify the inference that authority extended to doing the act in question. These directions for ascertaining authority are adapted from section 43, Comment, and Illustrations, Agency Restatement No. 1 of the American Law Institute. In applying them the ordinary experience, usages and habits of men are to be taken into consideration, and authority to use force will not be implied when the business intrusted to the agent is such that use of force is not a natural or ordinary means or incident of transacting it.

Suppose, in the case of the sale of the bay horse, the agent had authority to take the purchaser's post-dated check in lieu of cash, payment of the check was stopped, the agent demanded payment of the check, payment was refused, the agent then used physical force to compel the purchaser to pay, and the purchaser sustained personal injury. Could authority to inflict the injury be traced by implication to the principal? Certainly not as the result of application of the proposed method of ascertaining implied authority, nor by application of any other rational method.

In the case of *Crelly v. Telephone Co.*, 84 Kan. 19, 114 Pac. 386, the manager of a telephone exchange had authority to procure signatures of employees to salary vouchers. He asked the chief operator to sign a voucher for her salary. She declined until she could verify the amount. After another demand the manager struck the operator several blows because she refused to sign the voucher. The court held the telephone company was not liable for the manager's tort. The grounds of the decision were that, while the employment might have furnished opportunity and occasion for the assault, the assault did not grow out of the service which the agent was employed to perform; it was not an act which the principal could have anticipated the manager would do; there was nothing to show any connection between the assault and the duty devolving on the agent; use of force did not pertain to the business intrusted to the agent; use of force was not an incident of authority to procure signatures to wage vouchers; and to assault and beat a telephone operator is not a recognized or usual way of procuring her signature to a salary voucher. It will be observed the method employed in determining the question of implied authority corresponded very closely to the method proposed in Agency Restatement No. 1.

As indicated above, it would have made no difference in determining the question of authority if the manager had struck the operator in an effort to compel her to sign the voucher, and the court so stated. The situation would have been the same if the manager had assaulted the operator in an effort to compel her to pay money which he was authorized to collect, and in support of the decision the court cited just such a case. (*Collette v. Rebori*, 107 Mo. App. 711.) The result is, authority to collect money due the principal does not carry with it by implication authority to assault and beat the debtor to make him pay, because such use of force is not an incidental or subordinate act reasonably necessary or proper to carry into effect the main act of collecting; is not something usually and ordinarily done in making collections; does not conform to business usage; does not comport with the ordinary experience or habits of business men; and is not so related to the business of collecting money that authority to assault and beat is derivable from authority to collect.

Every decision of this court touching the principle involved, whether rendered before or since rendition of the decision in the Crelly case, has been examined. It may be observed that brief

summaries, in opinions, of former decisions are not always clear or always accurate. Ambiguous expressions may be found in opinions. Expressions are used which careful analysis reveals should not have been used. The soporifics, "acted within the scope of his employment," and "stepped outside the scope of his employment," are often used as if they disclosed grounds for implications of authority, or lack of authority. But, with possibly one exception, there is no pertinent decision in the Kansas reports which is inconsistent with the decision in the Crelly case. There is no decision which impairs authority of the Crelly case, and its doctrine has been approved and applied numerous times.

The exception referred to is the decision in the case of *Sipult v. Land and Grain Co.*, 94 Kan. 224, 146 Pac. 329. For many years the land of the company in Kansas had been in full charge of an agent who had authority to lease and to collect rent, and the testimony established the fact that his authority extended to putting an old tenant out of possession and putting a new one in. On the occasion giving rise to the litigation, the agent exercised his authority by adopting a rather fantastic scheme which, as was inevitable, brought on a fight. In some states force may be used to eject a tenant who wrongfully stays in, and to put another in his place. This is not true in Kansas, and it cannot be said that use of force was reasonably necessary or proper to oust the detaining tenant and seat another, or was the usual or ordinary manner of dealing with the situation which confronted the agent. His remedy was an action for forcible detention. The real basis of the decision was that the owner had given the agent such complete dominion over its Kansas lands that it should be regarded as doing whatever he did. The purported basis of the decision was, however, the law of principal and agent, and there was no purpose to apply principles somewhat analogous to those which underlie workmen's compensation acts.

Some of the cases relied on by Kastrup may be briefly considered.

In the case of *Wheeler & Wilson Mfg. Co. v. Boyce*, 36 Kan. 350, 13 Pac. 609, an agent had authority to sell sewing machines, to collect the price, and to recover possession of machines not paid for. A machine was sold to Boyce on a contract reserving title. The company claimed the price was not fully paid, and a replevin action was commenced to obtain possession of the machine. The replevin action was fruitless because the machine could not be

found. The agent then invoked a supplemental remedy provided by law for just such cases. Ultimately the company was defeated, and Boyce, who had been arrested on the process in aid of replevin, sued the company for false imprisonment. He recovered, and in affirming the judgment the court said:

"It is conceded that he [the agent] had authority to institute legal proceedings to recover possession of the machines conditionally sold and for which payment had not been made in accordance with the terms of the sale. The arrest and detention of Boyce was incidental to the replevin action, and was made as alleged to compel the delivery of the machine under a provision of the justices' code relating to replevin, which provides that where the defendants or any other persons knowingly conceal the property replevied, or, having the control thereof, refuse to deliver the same to the officer, they may be committed until they disclose where the property is, or deliver the same to the officer." (p. 354.)

Authority to bring the replevin action carried with it authority to do what was reasonably necessary and proper to make the replevin action effective, that is, authority to commence the second proceeding.

The decision in the Boyce case should be read with the decision in the case of *Laird v. Farwell*, 60 Kan. 512, 57 Pac. 98. Farwell was a chattel mortgagee of a stock of merchandise. Farwell put Curtis in possession, with the usual authority to sell and account for the proceeds. A creditor attached the goods. Curtis filed a complaint for perjury against the person who made the attachment affidavit, and he was arrested. The court properly held that Farwell was not liable for the act of the agent in causing the arrest.

In the case of *O'Banion v. Railway Co.*, 65 Kan. 352, 69 Pac. 353, plaintiff sued the railway company for damages for personal injury. Plaintiff claimed a brakeman pushed him off a train. The brakeman had authority to eject trespassers, and the company was accountable for the manner in which the authority was exercised. The brakeman had no authority from the company to push plaintiff off the train to extort money from him, or to punish him for not paying money, and the company was not liable for the consequences of such conduct. The facts were in dispute, and a demurrer to plaintiff's evidence was sustained. The court held the dispute of fact should be settled by a jury.

In the case of *Whitman v. Railway Co.*, 85 Kan. 150, 116 Pac. 234, a passenger stepped from a moving train at a station and broke his leg. The conductor told him the law required the con-

ductor to obtain a statement of the accident from every injured passenger, and on that false representation the passenger consented to wait and make a statement. The conductor in effect took control over the passenger in order to obtain the statement, and the passenger was delayed fifteen minutes. He sued for false imprisonment, and recovered. The company had prepared a form to be signed by passengers in case of accident, which stated that the law required railway companies to report accidents to the Interstate Commerce Commission. The company issued to conductors the following instructions:

"All conductors of trains carrying passengers must have a supply of this form on hand at all times when on duty, and as soon as possible after the occurrence of an accident the conductor will obtain from each passenger, . . . whether injured or not, a statement hereon and forward by the first train to the superintendent." (*Whitman v. Railway Co.*, 85 Kan. 150, 160, 116 Pac. 234.)

To induce, if the conductor could, the injured passenger, and other passengers if there were others, to wait before dispersing until their statements could be procured, was something directly related to and incidental and subordinate to the main act of obtaining written statements, and was reasonably necessary and proper to accomplish the main act. Authority to detain, by request or persuasion, was clearly implied, and if the conductor detained by falsehood or force, and injury resulted, the company would be liable.

In the case of *Lehnen v. Hines & Co.*, 88 Kan. 58, 127 Pac. 612, a hotel clerk used force to expel a guest who he claimed was disorderly. The clerk was the night clerk, in full charge of the hotel, and necessarily had implied authority to eject turbulent guests; but besides that the case fell within the well-discriminated class of cases involving affirmative duty to protect guests from annoyance and mistreatment.

In the case of *Mansfield v. Detective Agency*, 102 Kan. 687, 171 Pac. 625, a detective was employed to discover an ax murderer. Having concluded Mansfield was the culprit, the detective undertook to extort a confession from him. It was admitted the detective had authority to obtain the confession. The detective, who was a competent witness to prove his authority, said that whatever he did in trying to get a confession was done at the instance of his principal. The proof was that the detective used third-degree methods, and of course the principal was liable. Incidentally the court might almost

take judicial notice that a detective-agency detective who did not use the third degree to obtain a confession from one believed to be the ax murderer, Insane Blackie, could not hold his job.

It is not necessary to review other decisions of this court cited by Kastrup. Not one of them approves the primitive ultimatum, "Pay, or I'll take it out of your hide." The law of this state being well settled, it is not necessary to venture into the quagmire of decisions from other states.

In certain cases there may be no doubt that authority may be implied. In other cases there may be no doubt that authority may not be implied. In the penumbral region between the two classes of cases the question will be one for the jury. In the Crelly case a judgment based on special findings of fact and a general verdict for the plaintiff was set aside and the cause was remanded with instruction to sustain a demurrer which had been interposed to plaintiff's evidence. This was done because, given the two facts, authority to procure signature to a salary voucher, and assault and battery for refusal to sign the voucher, there was no reasonable ground for disagreement that authority to procure the signature did not carry with it an implication of authority to assault and beat. In this case the court holds that, given the two facts, authority of Harris to collect from Kastrup the amount of Kastrup's check, and assault and battery by Harris to compel Kastrup to pay, there is no reasonable ground for disagreement that authority to collect did not carry with it implied authority to assault and beat.

The judgment of the district court is reversed, and the cause is remanded with direction to enter judgment for defendant.